[Crim. No. 1958.   Third Dist.   June 7, 1946.]

THE PEOPLE, Respondent, v. GEORGE B. CARSON, Appellant.

Gumpert & Mazzera and J. Calvert Snyder for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, Chester Watson, District Attorney, and Anthony J. Chargin, Assistant District Attorney, for Respondent.

ADAMS, P. J.—In an indictment returned by the Grand Jury of San Joaquin County, defendant was charged with the commission of an assault upon Mildred Carson (his wife) with intent to commit murder. He pleaded not guilty, and not guilty by reason of insanity. He was tried by a jury which found him guilty of assault with a deadly weapon. The plea of not guilty by reason of insanity was withdrawn, and a motion for a new trial interposed. That motion was denied and defendant was sentenced to imprisonment in the county jail for a period of nine months, and fined $1,000.

On appeal from the aforesaid judgment defendant urges three grounds for reversal: One, the failure of the trial court to give a requested instruction on self-defense; two, the failure of that court to give a requested instruction regarding *circumstantial evidence;* and, three, error on the part of the trial court in restricting defendant's cross-examination of certain witnesses for the prosecution.

The instruction on self-defense requested by defendant reads:

"You are instructed that if you find from the evidence that the defendant George Carson, in repelling an attempt to use force or violence upon himself by Glenn Martin or any other person, said George Carson, as a reasonable man, was justified in believing that the persons attempting to use force or violence upon him intended to inflict serious injury upon him, then, and in that event, George Carson had a right, in defense of his person, to use all force necessary to repel the attempt to use force or violence upon him, even to the taking of someone else's life, if necessary."

The requested instruction which appellant designates as one on circumstantial evidence reads:

"I charge you that in order to convict the defendant George B. Carson of the crime of assault with intent to commit murder, or of the crime of assault with a deadly weapon, or simple assault, the facts proved must be consistent with the theory of his guilt and inconsistent with the theory of his innocence.

"I further instruct you that any theory of his guilt must not only be rational, i. e., based upon reason, but founded upon and limited within the evidence admitted in the case; and such theory cannot be based upon mere guess or surmise, nor upon conjecture or supposition."

On this subject the court did instruct as follows:

"There are two kinds of evidence recognized and admitted in courts of justice, upon either or both of which the jury may lawfully find the accused guilty of crime. One is the direct and positive testimony of a witness or witnesses to the actual commission of a crime; and the other is proof by testimony of a chain of circumstances pointing sufficiently strong to the commission of the crime by the defendant, and may consist of admissions by the defendant, plans laid for the commission of the crime, such as putting himself in any position to commit it, statements made previous to the commission of the crime tending to show intent or motive; or in short, any act, declaration or circumstance admitted in evidence tending to connect the defendant with the commission of the crime.

"In order to convict on circumstantial evidence, there must be produced the same degree of certainty as that which arises from direct testimony and excludes all rational probability of innocence. The circumstances must be of such a nature as not to be reasonably accounted for on the theory of the defendant's innocence, but perfectly reconcilable with the theory of the defendant's guilt."

Appellant's argument in support of the first of these proposed instructions, as stated in his brief, is:

"The testimony and theory of appellant's case was that whatever forces he used upon Mrs. Carson he did it in protecting himself from an assault upon his person by Mrs. Carson and her sons. The evidence so far as the appellant's case is concerned establishes that Mrs. Carson participated in the fray and that the appellant in protecting himself from the boys did use force upon her."

This calls for a consideration of the evidence adduced at the trial. It shows that defendant and his wife were married about 1934; that on July 21, 1945, they were living in Stockton, the household including Glenn and Clifford Martin, sons of Mrs. Carson, aged 17 and 19 years, respectively, Josephine Martin, the wife of Glenn Martin, Irene Carson, the daughter of defendant by a former marriage, and Johnny White, a friend of the Martin boys. About a month prior to the assault, dissension having developed between Mr. and Mrs. Carson, they entered into a property settlement under the terms of which defendant conveyed the home to Mrs. Carson, and the parties agreed to live separate and apart. Defendant had not, however, departed from the home on July 21st when the assault occurred.

On the afternoon of July 20th defendant called for Mrs. Carson at a beauty parlor, and on their way home, according to her testimony, Carson complained that he had found whiskey and gin in the automobile of one of the Martin boys, and made threats to kill not only Mrs. Carson, but the other members of the family. After arriving at the home, Mr. and Mrs. Carson went into the back yard, where, according to her testimony, Carson's threats to murder her and the rest of the family were repeated. She said that on previous occasions he had made similar threats, and that when they went through the house to the yard on the afternoon of July 20th, on seeing Glenn's wife, Josephine, defendant became enraged, called Josephine vile names and said he was going to kill her right then. Mrs. Carson went into the house and conveyed this information to Josephine and Irene who left the house. Later she heard them in the kitchen with Glenn, whereupon she entered again, but returned to the yard. Glenn then came out and asked Carson when he was going to quit threatening his mother and his wife. Carson jumped up as though he were going to strike Glenn, and Mrs. Carson ran and called Clifford and White. An altercation then ensued during which Glenn and Clifford asked defendant when he was going to leave, and Carson replied, "None of your G—— d—— business." Mrs. Carson then asked defendant to leave the house and go to a hotel, which he finally consented to do, and thereafter left.

Later, according to Mrs. Carson's testimony, he telephoned her saying first that he had not secured a room, and then that he had found one and would come out in the morning. Mrs. Carson, being in fear, locked the doors of the house and re-

tired to her bedroom. Not long afterwards she heard footsteps outside the house, and through a window saw Carson. He talked to her through the window, said he had not been able to get a room, and asked to sleep in the basement. She agreed but said he could not come into the house. She thereupon locked the door of her room, and again retired. After one o'clock in the morning she again heard footsteps and the door of her room was burst open by Carson. She jumped from her bed and was attempting to open the door of her bathroom when Carson caught her by the shoulder and began striking her. She said that he was not hitting her with his hands but with a hammer; that she fell to the floor and Carson kicked her; and that while he was leaning over her and she was trying to ward off his blows, her son Glenn ran into the room and engaged in a struggle with Carson, whereupon Mrs. Carson ran from the room. At this juncture her son Clifford appeared, followed by White, and Clifford assisted his brother in subduing Carson who assumed a position on the floor with his back against the wall, and his hands under the foot of the bed.

As to the extent of Mrs. Carson's injuries she testified that she was struck eight or nine times—once on the chin, once on the cheek, once on the throat, three times on the chest, and several times on her arm. The physician who examined her after the assault reported that she had "multiple contusions," the skin being broken on the chin and hand; that she had three loose teeth, and that "she was bruised up considerably all over." He stated that in his opinion the injuries were caused by a blunt instrument. Photographs showing her injuries were introduced in evidence.

According to the testimony of Glenn regarding his conversation with Carson in the back yard earlier in the evening, he asked Carson when he was going to leave and the latter said it was none of his G—— d—— business, and "took a swing" at him; that Mrs. Carson asked Carson to go down town, and that after Carson had departed Glenn and his wife went to a show; that on their return about 1 a. m. they saw Carson standing by a front window; that Mrs. Carson let them in; that after they had retired they heard footsteps outside the house, and again saw Carson; that Glenn then went to his mother's room, turned on the light in the living room, and returned to bed; that shortly afterwards he heard the door to his mother's room crash and heard his mother

scream, whereupon he ran to her room and saw her lying on the floor and Carson standing over her; that he jumped on Carson, knocking him over, and while they were struggling he took a hammer away from Carson and struck him with it; that as Carson fell Mrs. Carson ran from the room, and Clifford and White came in; that he then handed the hammer to Clifford, and, as he had entered previously without any clothes on, put on some garment which his wife brought him.

Clifford testified that he and White were sleeping on a porch off the dining room when he heard his mother scream; that he burst through the locked door into the dining room, and as he did so heard Carson say, "I will kill you"; that as he reached the door of his mother's room his mother was just coming out; that he hit Carson, who was struggling with Glenn, and that Carson fell and crawled against the wall with his hands under the bed; that Glenn then had the hammer in his hand, and later, when the police arrived, handed it to one of the officers.

In the meantime Irene, at Mrs. Carson's request, had attempted to telephone the police but found the telephone dead, later investigation showing that it had been disconnected in the basement. Irene then ran to a neighbor's and telephoned, and two police officers appeared almost immediately.

White testified that he heard a scream, saw Clifford burst through the dining room door, and followed him to Mrs. Carson's bedroom; that Mrs. Carson was "kind of staggering out, holding her face on her arm"; that he found Carson on the floor; that when the police arrived Carson first said that he was sorry, that he did not mean to do it, and that he wanted to die, then became abusive and called his wife "some names."

As Clifford and Glenn had sustained some injuries they, with their mother and Carson, were taken to the emergency hospital. After having their wounds dressed all but Carson returned home. They found Irene trying to clean up blood on the floor of Mrs. Carson's bedroom; and Clifford and White both testified they were present when Irene found an open knife—which she later testified was her father's—in a pool of blood under the bed where her father's hands had been.

Carson, testifying in his own behalf, stated that he had found liquor in Clifford's car the afternoon of the 20th and that he had a conversation with Mrs. Carson about it on their

way home from the beauty parlor. He denied that he had made any threats then or at any other time except that he had playfully told his wife that he "would throw her in the lake," or something of that sort. Regarding the conversation in the back yard he denied that he made any threatening gestures, but said that Glenn, and later Clifford, asked him "When in the hell are you getting out," told him to get out immediately, and made other remarks about getting him out. He admitted that the liquor in Clifford's car was referred to and that White stated that it was his and not Clifford's or Glenn's. Regarding the later events of the evening he said that he had phoned Mrs. Carson from downtown that he was unable to get a room; that he came to the house and talked to her through the bedroom window and she told him she did not want him around; that he then went and sat in his car, which he had parked a half block away, but finally decided to sleep on the chesterfield in a room in the house which he called his office; that to gain access thereto he cut the screen and entered through the window, and seeing a light in the living room he unlocked the office door and saw Mrs. Carson enter her bed-room and close the door; that contemplating that she would lock it he "went against" it and broke it. As to what transpired thereafter his story differed from that of the other witnesses. He said that he took hold of Mrs. Carson's shoulder and sat her on the bed; that she jumped up and screamed and dropped at his feet; that he stepped over to assist her to rise, and while stooped over her someone entered and began hitting him on the back; that he found Glenn hitting at him with a hammer; that he prevented him from striking him only on the arms; that Mrs. Carson was also pushing and shoving him; that he finally grasped the hammer and fell in front of the dresser; that they had not struck him until Clifford ran in with something in his hand, and made a lunge at him; that he (Carson) had the hammer in one hand "to protect" himself, and as Glenn grabbed the hammer kicked Mrs. Carson in doing that, and Clifford then struck him over the head, and that he had no remembrance of anything further except that he dimly remembered asking his daughter Irene to take his wallet out of his pocket. He said that he did not strike Mrs. Carson with the hammer or otherwise, except that he hit her with his elbow "to get her out of our way during the struggle," after Glenn came in. On cross-examination he said that he thought that Glenn hit him four blows with the ham-

mer, that he turned and saw him with it in his hand, and tried to grab it. He then denied that he kicked Mrs. Carson or that he ever succeeded in taking the hammer from Glenn. He denied that he owned or had ever seen before the pearl handled pocket knife which Irene found in the room and identified as his, but admitted he owned two pearl handled knives.

■■ Returning now to consideration of appellant's proposed instruction regarding self-defense, it becomes apparent that same was properly refused for two reasons, one that the instruction itself is erroneous; and, two, that defendant himself was the aggressor, that his wife made no assault that called for any self-defense from her, and that, as matter of fact, he denied that he made any assault upon her either in self-defense or otherwise.

Appellant defends the requested instruction itself by saying that it was taken from *People* v. *Zuckerman,* 56 Cal.App.2d 366, at page 372 [132 P.2d 545], in which this court approved an instruction which read:

"You are further instructed that if you find from the evidence that the defendant in repelling an assault by either or both of the Danders made upon him (the defendant), the defendant as a reasonable man was justified in believing that either or both of the Danders intended to inflict serious injury upon him, the defendant, the defendant had a right in defense of his person to use all force necessary to repel the assault upon him, even to the taking of the life of either or both of the Danders."

But the foregoing instruction does not state that even in defense of his person one may use force necessary to repel the attempt to use force and violence upon him even to the taking of *someone else's life;* and had the instruction requested been given it would have told the jury, in effect, that if they believed that in repelling an attack upon him by Glenn or Clifford, defendant as a reasonable man was justified in believing that *they* intended to inflict serious injury upon him, then he had a right, in defense of his person, to repel the attack even to the taking of Mrs. Carson's life. No authority for such an instruction is cited, and we know of none.

Appellant, tacitly admitting that the proffered instruction was improper, asserts that nevertheless the court of its own volition should have given an instruction on self-defense, citing *People* v. *Leslie,* 9 Cal.App.2d 177 [48 P.2d 995], which

he refers to as a similar case. But in the Leslie case the appellate court said that the evidence was conflicting as to whether defendant, in committing the assault upon Mrs. Zurndorfer, the victim thereof, was defending himself from an attack *by her*. The evidence in that case is not comparable to that before us. Here defendant does not contend that he struck Mrs. Carson in repelling an attack made by her or that he considered himself in danger from her. He denies that he struck her at all, except that he struck her with his elbow to get her out of the way during the struggle.

Furthermore, the evidence is sufficient to show that the defendant was aggressor in this affray; that after making threats he broke into the house, forced his way into his wife's bedroom, and thus precipitated the struggle with her two young sons when they came to their mother's defense. Under such circumstances no instruction on self-defense was called for. In *People* v. *Holt*, 25 Cal.2d 59, 65 [153 P.2d 21], it was urged that on defendant's version of the homicide with which he was charged, he had a right to stand his ground, and that it was error not to instruct the jury on self-defense. The court said, page 65, that other evidence in the case overwhelmingly established that defendant was not without fault, that he himself invited the encounter, and that as a reasonable man he was not warranted in believing that he was in such imminent danger of great bodily injury as to justify the commission of a homicide, and that under those circumstances it was not prejudicial error to fail to instruct on this phase of the matter in quesion. The court there quoted from *People* v. *Westlake*, 62 Cal. 303, 307, as to the pertinent principles governing the right of self-defense. *People* v. *Soules*, 41 Cal. App.2d 298, 314 [106 P.2d 639], was also cited, and 1 Wharton's Criminal Law, 828-832, sections 614 and 615, was quoted to the effect that if the defendant in any way challenged the fight and went to its armed, he could not afterward maintain that in taking his assailant's life he acted in self-defense. And finally, the court said in the Holt case, page 67:

"The overwhelming weight of the evidence, including defendant's own testimony and extra judicial statements, establishes that defendant was not an innocent person suddenly confronted with imminent danger of great bodily harm. On the contrary, the evidence shows that he was the 'first wrongdoer' in that by his quarrelsome and challenging attitude, not only toward deceased but others in touch with him a short

time prior to the homicide, he had created an atmosphere of antagonism that might naturally lead to physical combat if he continued, as he did, in his quarrelsome pursuit of trouble. Defendant, therefore, was not without substantial fault, a condition essential under the authorities to permit an accused to stand his ground and slay his adversary without first having sought to retire from the combat. Under all the circumstances, it cannot be said that the trial court erred to defendant's prejudice by failing to give an instruction on the right to stand one's ground and slay an adversary.'' (Also see 13 Cal.Jur. § 45, pp. 644-645; *People* v. *Hecker,* 109 Cal. 451 [42 P. 307, 30 L.R.A. 403]; *People* v. *Barber,* 62 Cal.App. 2d 206, 213 [144 P.2d 371].)

Regarding the second of the requested instructions, while appellant refers to it as one on circumstantial evidence, it does not, in fact, refer to circumstantial evidence at all. It merely states that the facts proved must be consistent with the theory of guilt and inconsistent with the theory of innocence. But if it was intended to be one on circumstantial evidence its substance was included in the instruction which the court did give, and in a form much more favorable to defendant, for the court defined circumstantial evidence and stated that to convict thereon, the ''circumstances must be of such a nature as not to be reasonably accounted for on the theory of defendant's innocence, but perfectly reconcilable with the theory of defendant's guilt.'' Defendant finds no fault with the instruction given, and it is obvious that the requested one would have added nothing regarding the degree of proof necessary to convict on circumstantial evidence—the only ground upon which appellant's argument is based.

Furthermore, where, as here, the evidence of guilt is direct rather than circumstantial, it has been held in numerous cases that failure to instruct on circumstantial evidence is not reversible error. In *People* v. *Marvich,* 44 Cal.App.2d 858, 861 [113 P.2d 223] (hearing in Supreme Court denied), the court said that as the evidence was direct, there was no occasion for giving an instruction that in the case of two theories, one pointing to innocence and the other to guilt, they should adopt the theory pointing to innocence. In *People* v. *Ortiz,* 63 Cal.App. 662, 667 [219 P. 1024], also an instruction was proposed to the effect that if circumstantial evidence leads to two opposite conclusions, one consistent with guilt

and the other with innocence, the jury should acquit. The court held that the refusal to give such instruction was not error, saying: ''The evidence was not circumstantial but the positive testimony of eyewitnesses. The court instructed the jury fully on the question of burden of proof and reasonable doubt and it was not error to refuse the proposed instruction,'' citing *People* v. *Plumeyer,* 54 Cal.App. 786 [202 P. 888]. In *People* v. *Savage,* 66 Cal.App.2d 237, 247 [152 P.2d 240] (hearing in Supreme Court denied), the court said that where the proof is not entirely circumstantial it is not error to refuse an instruction requiring the jury to adopt that interpretation which would admit of defendant's innocence and to reject that which would point to his guilt.

But even if the requested instructions had been proper in the case, the evidence of defendant's guilt was clear and convincing, and failure to give them would not justify reversal. (Const., art. VI, § 4½; *People* v. *Kelso,* 25 Cal.2d 848, 853 [155 P.2d 819], and cases there cited.)

Appellant's final ground for reversal is that the trial court unduly limited the cross-examination of Mrs. Carson and her two sons, ''as to circumstances surrounding the keys, the car, the bonds, and other items of value belonging to the appellant which appellant maintained these witnesses took.'' Appellant's own testimony was that in the room in the home which he referred to as his office, there was a ''strong box'' which contained insurance and other papers and three $1,000 bonds which ''we'' kept locked, and that the key of same, together with the key to the office and desk therein, and his car key he kept on a key ring, which he had in his pocket with his wallet when he went down town in the evening; that after the events of July 21st he asked Mrs. Carson for some papers that were in the box and for the bonds and she said she did not have the keys, and could not open the box; but that she subsequently gave him some papers that came out of the box.

In the first cross-examination of Mrs. Carson she testified that there was no ''strong box'' in the office, but was a little tin box in which ''we'' kept insurance papers and things of that sort. She was then asked if she did not go and get this box as soon as appellant was taken away, and she answered that she was in no condition to do so. An objection by the prosecution was then sustained, and permission was given defendant to recall the witness for further cross-examination

if the subject matter became material. In his cross-examination of Clifford appellant's counsel asked him if, after Carson was in the hospital, Clifford had not taken defendant's car for a trip to Los Angeles, and if he had not gone through Carson's pockets when he was on the floor. To the latter question he made denial, and objection to the former was sustained, with final ruling reserved.

Subsequently Mrs. Carson was recalled for further cross-examination and was again asked if she did not get some keys from Carson's person and if she did not then have any of the keys, to which she replied in the negative. She was then asked if the boys had not been driving the car, and objection was sustained. She was then asked if she had "that strong box" and answered that she had a little tin box, that she opened it without a key by breaking it open; and that, at his request, she delivered all of the contents to Carson. She was then asked what she did with the bonds and if she still had them in her possession, but objection to said questions were sustained. She said she had opened the desk, and when again asked if she had not the keys and if she had not taken them out of Carson's pocket, said that she had been unable to locate the keys. She was then asked if she went through Carson's office but objection was sustained.

Clifford was called for further cross-examination and asked if he took any keys out of Carson's pocket that night and if he had a key to the car. He answered no. Objection to a question as to whether he took the car and drove it to Los Angeles was sustained. Mr. Snyder then said, "I don't think I reserved the right to call Glenn; perhaps I should have; I think it was Glenn and not Clifford." Glenn was then called, was asked if he did not go through Carson's office that night before he was taken to the hospital, if he saw anyone take any keys or if he took any keys out of his pocket, to which he replied that he did not. No other question was asked of the witness.

It is apparent from the foregoing that the only questions asked which were unanswered were those pertaining to whether one of the boys drove Carson's car to Los Angeles. Clifford only was asked this question, and though Mr. Snyder said he thought it was Glenn, the latter was not further interrogated on this point. Furthermore, we agree with the trial court that whether they did or did not was immaterial. As for the questions asked Mrs. Carson about the keys and

the bonds, she answered the same; and finally we can find no testimony by Carson that he did not himself have both the keys and the bonds—if there were any—in his possession. In fact, he was asked on cross-examination if he did not generally have the key to the office. He replied: "Yes, I have the only key." Defendant's counsel's cross-examination of Mrs. Carson covers 75 pages of the record, his cross-examination of Clifford 39 pages, and that of Glenn 59 pages, so it is apparent that sufficient latitude was given him in that respect. He does not point out a ruling on any specific question asked by his counsel which he contends constituted prejudicial error, and in view of the fact that the evidence of his guilt is clear and convincing we are satisfied that there was not any such error.

The judgment and the order denying a new trial are affirmed.

Peek, J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 2, 1946. Carter, J., voted for a hearing.

[Crim. No. 1961. Third Dist. June 7, 1946.]

THE PEOPLE, Respondent, v. CARLOS TOPETE DUENAS, Appellant.

George E. Foote for Appellant.

Robert W. Kenny, Attorney General, and James O. Reavis, Deputy Attorney General, for Respondent.

THOMPSON, J. — The defendants were jointly charged and tried by a jury for the crime of murder. They were represented by separate counsel. A verdict of manslaughter was rendered against each. The defendant, Carlos Topete

Duenas, moved for a new trial, which was denied. The co-defendant, Cuevas, has not appealed. From the judgment and order denying a new trial this appeal was perfected by the defendant Carlos Topete Duenas.

It is contended that the verdict and judgment are not supported by the evidence; that the prosecution failed to prove the corpus delicti, and that the court erred in refusing to give to the jury two instructions regarding the proof which is necessary to convict an accused person as an accessory to a crime.

The defendants were friends. They lived in Sacramento. The appellant was unmarried. The wife and family of the codefendant, Cuevas, live in Mexico. At about 9 or 10 o'clock on the night of July 16, 1945, the defendants went together to the Nordeste Club on N Street in Sacramento, where they ate a meal. At 11:30 o'clock that night, Rosendo Meza and his wife, Irene, who live at Vina, eighteen miles from Chico, arrived at the club.

They went there with the deceased, Edwin Chabez, and a woman by the name of Jane, with whom he was living. They were seated at the bar. Mrs. Meza is a niece of Jane. The defendants were first seated at a table in the same room. They went to the bar and ordered beer to drink. There is a conflict of evidence regarding the identity of the defendant who offended Jane by pouring some beer upon her, but she testified that the appellant, Carlos Duenas, whom she identified as "the man in the blue shirt," offered her a drink, which she refused, and that he then poured the beer on her leg. That incident started a quarrel between the men of the respective parties. Mr. Nordeste, the proprietor of the club, stopped the argument by saying to the defendants, "You better leave, you have to go." The defendants then left the club and crossed the street, remaining on the sidewalk on the opposite side of the street beyond a parked car, for several minutes, until Mr. Meza, Edwin Chabez, the deceased, and the women emerged from the building. Regarding the affray which then followed, there is a serious conflict of evidence, even between the defendants themselves.

Regarding the actual affray, Rosendo Meza testified to the spilling of beer on the person of Jane Chabez, the quarrel which resulted therefrom, and the departure of the defendants at the request of the proprietor. Mr. Meza then said "They [the defendants] went across the street and they waited there for us to come out"; that "we stayed there about a half an

hour more and it was 12:00 o'clock. We came out together, . . . Eduardo Chabez, Jane, Irene and myself." The witness said they were walking on Third Street toward Capitol Avenue, when the defendants came toward them, cursing them and demanding that they "come out and fight." He said that Chabez then "gathered a piece of stick that was near a fence and he went to the middle of the street"; that both of the defendants were then in the middle of the street, and that the "taller man had . . . a piece of stick; a broom handle or something." He then testified that the appellant, Duenas, who was identified by the witness in the courtroom, struck Chabez [with] a knife, and that the deceased fell and was lying on the street, and that "He ran, that man." On cross-examination the witness was asked "Did you or did you not see Duenas have a knife in his hands that night?" to which he replied "Yes, I did see it." The witness then picked up the wounded man and assisted him to walk toward the sidewalk. He said Chabez was unable to walk and that he "then sat down on the street." The witness said "I saw his pants full of blood and he asked me to call a car *because he was already cut.*" A cab was called and Chabez was taken to the hospital, and died the following day, as the result of that wound.

Doctor John Kassis testified that he performed an autopsy on the body of the deceased and that he died as the result of a wound near the left groin which severed the femoral artery. He said "it was about a half inch cut . . . three inches deep." He said that the artery was cut and that the deceased bled to death from that wound.

Jane Chabez corroborated much of the material testimony of the witness, Rosendo Meza. Irene Meza testified that both defendants "were together" in the street at the time of the affray; that she saw "this man Duenas . . . bending over Edward;" that "the short guy . . . had a knife in his hand." She admitted that she did not see the fatal blow struck but said, "when I followed him up . . . he had a knife in his hand." She said that both defendants came across the street toward them when they came out of the club; that she saw "both these men close to him [the deceased] . . . they were very close to him," and that the shorter man (Duenas) had a knife in his hand. She also testified that after Chabez fell down, both defendants "ran . . . around the corner toward Fourth on N."

The codefendant, Cuevas, contradicted the appellant's claim that he was not present during the affray but stood sixty paces or more away. Cuevas testified that after they left the club and crossed the street they remained on the sidewalk a few minutes and that Duenas asked him to return with him to the building so that he could pay for the drink which he had ordered; that they then crossed the street together; that they did not then enter the building, but the deceased and his party soon came out, and Chabez armed himself with a club. The witness admitted that he also picked up a stick. The witness testified that when they saw the people coming out of the saloon, Carlos Duenas "crossed the street first and followed them"; that the deceased had the stick in his hand, and when he stepped off the sidewalk he hit Duenas, breaking the stick. He said that Chabez then "fell down and rolled over to the middle of the street." The witness denied that either he or Duenas had a knife or that they used one in that affray. He did testify that Chabez was armed with a knife. He said that after the incident "Duenas told me, 'Come on, let's go, *because I have stuck him*,' and then we walked together on the street and turned the corner and went away." The defendants then went to a restaurant and ate another meal together. They were subsequently arrested and jointly tried for the crime of murder. Each was convicted of manslaughter.

The corpus delicti was sufficiently established. The elements necessary to be proved in a homicide case to establish the corpus delicti are merely to identify the body of the deceased, and to show that he was killed by means of an unlawful agency. (*People* v. *Spencer*, 58 Cal.App. 197, 221 [208 P. 380]; *People* v. *Cornett*, 61 Cal.App.2d 98, 105 [141 P.2d 916]; 13 Cal.Jur. § 68, p. 676.) In the present case, the physician who performed the autopsy testified that Chabez died as the result of bleeding to death from an artery which was cut by a sharp instrument; that the wound was near the groin and it was half an inch wide and three inches deep. That wound indicated that it was inflicted by a knife. Three witnesses saw a knife in the hands of the appellant at the time of the affray. On cross-examination the doctor did answer the question, "It could have been caused by a stick?" by replying, "Yes." There is evidence that the deceased had a stick in his hand, but our attention is not called to any evidence indicating that it had a sharp point which could have

inflicted that wound. Evidently the jury did not think so. There is an abundance of evidence to satisfactorily show that the deceased was cut while he was engaged in the affray with the appellant, Duenas. Chabez then fell down, and he said "he was already cut." It is highly improbable that he was cut in any manner other than by means of the knife which was seen at that time in the hands of the appellant.

The evidence adequately supports the verdict and judgment of conviction of manslaughter. It is true that, upon cross-examination of the witness Meza, it appeared from the transcript of his preliminary examination that he had made statements contradictory of his testimony at the trial, with respect to his claim that he had seen a knife in the hands of the appellant at the time of the affray, and possibly regarding some other essential incidents of the conflict. That evidence was offered for the purpose of impeachment. We must assume that the jury, under proper instructions, gave full consideration to that impeachment evidence. The question of the weight of the evidence was exclusively within the province of the jury. We may not interfere with that province. The testimony of other witnesses corroborates his statement at the trial that the appellant did have a knife in his hands at the time of the affray.

The chief contention of the appellant is that he was not present when the conflict occurred. He claims that he was sixty paces or more away from the scene. But that claim is refuted by all of the other witnesses, including his codefendant. Cuevas not only testified that Duenas was present and that he was hit by a stick in the hands of Chabez just prior to the time the deceased fell to the ground, but he also said that Duenas then said to him, "Come on, let's go, because I have stuck him." Regardless of the conflict of evidence and of the apparent conflicting statements of the witness, Rosendo Meza, we are satisfied there is ample evidence to support the judgment of conviction of the appellant of the crime of manslaughter.

A witness may be impeached by evidence that he has made, at other times, statements inconsistent with his testimony given at the trial. (Code Civ. Proc., § 2052.) When a witness is successfully impeached, the jury may disregard his testimony. (*People* v. *Phillips*, 70 Cal. 61, 69 [11 P. 493].)

But the fact that a witness made statements at another

time which were contradictory of his testimony given at a trial, does not necessarily require the jury to reject his entire testimony. Such impeaching evidence is received only for the purpose of testing his credibility. The weight of such impeaching evidence is solely a question for the jury or the trial judge. (*Goodwin* v. *Robinson*, 20 Cal.App.2d 283, 288 [66 P.2d 1257]; 27 Cal.Jur. § 156, p. 182; 70 C.J. § 1338, p. 1152.) It is not the privilege of the reviewing court to pass upon the weight or effect of impeaching evidence, or the weight to be given to the testimony of a witness at the trial, unless his evidence clearly appears to be inherently improbable, which we may not hold to be the fact under the circumstances of this case. The witness, Meza, denied at the trial that he had previously stated he did not see a knife in the hands of the appellant, Duenas. At the trial, he positively asserted that he did see the knife in the hands of the appellant. That fact was corroborated by two other witnesses. The proceedings at the preliminary hearing indicates that Rosendo Meza did state that he did not see a knife in his hands. At the trial he insisted that he did see the knife in his hands. The defendants were strangers to the prosecuting witnesses. The evidence satisfactorily shows that one of the defendants cut the deceased with a knife. It indicates that the appellant cut the deceased. Since they were both engaged in the affray it is immaterial which one actually used the knife. It is not surprising that there may have been some confusion on the part of the witness in identifying the defendant who was seen with the knife in his hands. The credibility of the witness and the weight to be given to the impeachment testimony were exclusively the province of the jury.

The court properly instructed the jury, pursuant to section 2052 of the Code of Civil Procedure, that a witness may be impeached by evidence that he has made, at other times, statements inconsistent with his testimony at the trial. It was also instructed that the jury has the sole discretion to determine the weight of the evidence and the credibility of witnesses and that when a witness has wilfully sworn falsely upon a material issue that his entire evidence may be distrusted or rejected. Those instructions amply protected the appellant's rights. The jury could not have been misled upon that principle of law.

The appellant failed to show that the rejected instructions upon the subject of aiding and abetting the com-

mission of the crime were prejudicial. We must assume in support of the verdict and judgment that the two rejected instructions were adequately covered by other proper instructions which were given to the jury. (*Podesta* v. *Delucchi,* 100 Cal.App. 249 [279 P. 1061]; *Goldman* v. *Dahlberg,* 79 Cal. App. 380 [249 P. 536]; 2 Cal.Jur. § 509, p. 869.) The record discloses the fact that the first asserted omission was actually given to the jury in almost the exact language contained in appellant's proffered instruction, and that appellant's instruction number seven was adequately covered by other instructions which were given to the jury.

The appellant assigns the alleged refusal of the court to give to the jury his proposed instructions numbers one and seven as prejudicially erroneous. They are based on the provisions of section 31 of the Penal Code, which declares that all persons concerned in the commission of a crime are deemed to be principals, whether they directly commit the act constituting the offense, or "aid and abet in its commission." That instruction was given to the jury. The appellant is mistaken in asserting that his instruction number one was refused. It was given to the jury in the following language:

"For one person to abet another person in the commission of a criminal offense, simply means, to knowingly and with criminal intent, aid, promote, encourage or instigate, by act or counsel, or by both act and counsel, the commission of such criminal offense."

Since the appellant had testified that he was not present at the time of the affray, and upon the contrary that he then stood at a distance of sixty paces or more away from the place where it occurred, the court fully and fairly instructed the jury upon the necessity of corroborating the testimony of an accomplice, and defined that term in the language of section 1111 of the Penal Code.

The appellant does not complain of the refusal to give several of his proffered instructions which were drawn on the theory that he was not present at the time of the affray. We assume that is because all of the other witnesses, including the codefendant, Cuevas, testified that he was present. The evidence is very convincing that the appellant was present and that he participated in the affray.

The appellant's instruction number seven, which was refused, is inconsistent with his testimony that he was not present. It merely states that it is not sufficient to prove that a

defendant is present and has the opportunity to commit the offense, but that the prosecution must prove that he "aided, promoted, encouraged and instigated by act or counsel or by both act and counsel, the commission of such criminal offense." The essential language of that refused instruction was included in the foregoing quoted instruction which was given to the jury. The court further fully instructed the jury that the burden was on the prosecution to prove every essential element of the crime beyond a reasonable doubt, and that if a doubt remained in the minds of the jurors as to the guilt of the accused, it was their duty to acquit the defendant. We are convinced that the defendant was not prejudiced by the refusal to give instruction number seven.

Moreover, the evidence satisfactorily shows that the appellant participated in the controversy and in the affray as a principal whether he or his codefendant actually stabbed the deceased. There is no miscarriage of justice.

The judgment and the order are affirmed.

Adams, P. J., and Peek, J., concurred.

[Civ. No. 3377.   Fourth Dist.   June 7, 1946.]

REX GOSSETT et al., Respondents, v. E. J. SCHABELITZ, Appellant.

Luce, Forward, Lee & Kunzel for Appellant.

Walker, Adams & Duque and Gray, Cary, Ames & Driscoll for Respondents.

BARNARD, P. J.—This is an action for declaratory relief, to determine whether a certain business was operated as a corporation, a partnership or a joint venture, to determine the respective interests of the parties in this business, and for an accounting.

For some years E. J. Schabelitz conducted a business in San Diego under the name of Schabelitz Research Laboratories. On May 10, 1941, he entered into a written partnership agreement with one Morgan and from that time until about February 1, 1942, the business was carried on by that partnership. More money was then needed to finance the manufacture and sale of a certain prophylactic which had been developed by Schabelitz, and which had been accepted by the army and the navy. About that time James E. McMurray and his stepson, Roger T. Smith, entered the picture. McMurray suggested the formation of a corporation and gave Smith a check for $2,500, which was put in a special account in a bank in Smith's name, to be used in the business.

On February 14, 1942, an agreement was signed by Schabelitz, Smith and Morgan, which provided that a corporation should be organized to be known as Schabelitz Research Laboratories, Inc.; that Schabelitz should convey to the corporation the personal property theretofore used in the business, including formulas, chemicals, etc., in return for 50 shares of the common stock of the corporation; that Morgan should convey his interest in this property to the corporation in return for 50 shares of preferred stock; that Smith should pay to the corporation $5,000 for 50 shares of common stock; and that the agreement was conditional upon the corporation being "incorporated" within 90 days, and upon the application with reasonable diligence for a permit authorizing the issuance of the shares thus conditionally subscribed for.

On March 5, 1942, articles of incorporation were filed in the office of the Secretary of State which were signed by McMurray, Schabelitz, Smith and two others who are not material here. The franchise tax was paid for the year 1942 and some stationery bearing the corporate name was "used in the trade." However, no transfer of the property previously used in the business was ever made to the corporation by Schabelitz or by Morgan, no application for permission to issue stock was ever filed with the Commissioner of Corporations, no permit to issue stock was ever given, and there was never any meeting of the stockholders or election of directors.

The business of operating the laboratories and the manufacture and sale of the prophylactic was continued with Smith taking an active part therein and furnishing more money from time to time. About June, 1942, the plaintiff Gossett joined the business, putting in his time and later putting in money. On July 24, 1942, an agreement was signed by Schabelitz, Smith and Gossett which, after declaring an intention to apply to the Corporation Commissioner for permission to sell shares of stock, provided that Schabelitz agreed to purchase 10/37 of the first block of stock of the Schabelitz Research Laboratories, Inc. which the commissioner should authorize to be sold and in return therefor to convey to the corporation the properties known as the Schabelitz Research Laboratories, with all formulae and equipment involved in the manufacture of prophylactics; that Smith agreed to purchase 17/37 of the first block of stock thus authorized to be issued and to pay therefor the sum of $8,500 or to cancel indebtedness in an equivalent amount; and that Gossett agreed to purchase 10/37

of the stock so authorized to be issued, and to pay $5,000 for the same.

On July 30, 1942, Smith, Schabelitz and Gossett signed an agreement agreeing that they thereby elected themselves as temporary officers of the corporation. About this time these parties discussed Morgan's interest in the assets of this business and some sort of an account was set up purporting to show that the corporation owed Morgan $5,000.

After July 24, 1942, Gossett, Smith and Schabelitz continued to operate the business. Shortly after that date they agreed that it would be better to abandon their plan of operating this business as a corporation and planned to undertake to form of partnership for the conduct of the business. Several drafts of proposed partnership agreements were prepared over a period of two or three months, but the parties were unable to agree on the terms and no such agreement was ever signed. Serious differences arose between these parties over the way in which the business was, and should be, carried on and they were also unable to raise sufficient money with which to manufacture goods and handle orders which were coming in. During October, 1942, as the court found, "the said business enterprise was without funds" and owed bills amounting to about $7,000, and by December, 1942, the indebtedness had increased to $12,638.88. As the court found, Gossett and Smith have not taken any part in conducting the business since October, 1942, and since that time the business has been conducted by Schabelitz. It further appears that Schabelitz borrowed on his own credit sufficient sums to pay off substantially all of the unpaid debts of the enterprise and that these amounts have since been repaid to him out of the business.

In June, 1943, Gossett and Smith brought an action in the United States District Court against Schabelitz seeking to dissolve a partnership known as "Schabelitz Research Laboratories, Inc." and asking for an accounting. By its judgment, which has become final, that court adjudged and decreed that no partnership existed between these parties and that "plaintiffs are not entitled to any decree dissolving any partnership, or to any decree dispelling the defendant from any partnership, or permitting the plaintiffs or either of them to continue the operation of any partnership, or for any partnership accounting."

Thereafter, this action was filed. The court found most of the facts above set forth and in addition made a number of findings to which brief reference may be made. It was found that the preorganization agreement of February 14, 1942, was executed with the intention of forming a corporation and having stock issued in accordance with its terms; that this agreement is a valid and binding agreement and was not made in violation of law; that by reason of said preorganization agreement and the subsequent filing of articles of incorporation of Schabelitz Research Laboratories, Inc., said corporation ''came into being and became the equitable owner'' of the property described in that agreement which was to be conveyed to the corporation by Schabelitz; that the corporation then ''assumed control of the assets theretofore owned by the Schabelitz Research Laboratories, a partnership, and received and disbursed funds furnished by plaintiff Smith''; that while no property was transferred to the corporation by Schabelitz or by anyone else Schabelitz has, by his acts and conduct, treated ''said described property'' as belonging to said corporation and is estopped to deny that this property is the property of the corporation; and that the corporation is the owner of the property described in the agreements of February 14 and July 24, 1942.

It was also found that, in entering into the purported agreement of July 24, 1942, the plaintiffs and the defendant conspired together to evade and violate the Corporate Securities Act (Stats. 1917, p. 673, as amended; Deering's Gen. Laws, Act 3814) ; that neither at that time nor later did they intend to apply to the Corporation Commissioner for any permit for the issuance of such stock; that they depended upon that purported agreement to obviate the necessity of any such permit; that this was a device by which these three parties attempted to effect a transfer of the interest of Morgan to Gossett; and that the transaction represented in said purported agreement of July 24, 1942, is illegal and void.

It was further found that on or before November, 1942, Smith advanced $8,500 for 17/37 of the corporate assets, Schabelitz turned over property of the value of $5,000 for 10/37 of the corporate assets, and Gossett advanced to the corporation $5,000 for 10/37 of its capital assets; that these contributions were made without a permit from the Corporation Commissioner; that in addition to such contributions Gossett advanced $278.04 to the corporation and Smith ad-

vanced to it $6,772.77; and that the corporation received these sums from these plaintiffs. As conclusions of law, it was found that no partnership ever existed; that all of the parties are estopped to deny that the corporation is the owner of the property which was to be conveyed to the corporation under the terms of the agreement of February 14, 1942; that the agreement of July 24, 1942, is illegal and void; that neither Smith, Gossett nor Schabelitz are entitled to any redress on account of any funds or property they contributed "for any share of the corporate assets," but that Gossett is entitled to recover $278.04 and Smith to recover $6,772.77, with interest, these being the amounts they contributed in excess of the amount of their subscriptions for stock in the corporation. Judgment was entered that Gossett and Smith recover these respective amounts from the corporation, that Schabelitz is estopped from denying that the corporation is the owner of all the property used in this business, that he has no right, title or interest in or to any of these properties, and that nothing contained in the judgment shall prejudice the right of any party to the action to later perfect his right to become a shareholder in the corporation. The defendant Schabelitz has appealed from the judgment contending, among other things, that the findings and judgment are not supported by the evidence and that the judgment is contrary to law.

A number of the court's findings and conclusions are entirely unsupported by the evidence in the record. There is nothing in the agreement of July 24, 1942, which discloses on its face that it is illegal or in violation of the Corporate Securities Act. It specfically provided for the issuance of stock only when the same should be authorized by the Commissioner of Corporations. While it does not mention Morgan's interest not only was he to receive preferred stock, instead of common stock, but it does not appear that other arrangements had not been made which were satisfactory to him. And there is no other evidence that the parties did not intend to apply for a permit, as provided in that agreement, or that in entering into it they conspired to evade the Corporate Securities Act. The evidence discloses, without conflict, that at that time the parties did intend to secure a permit for the issuance of the stock.

The finding that by reason of the preorganization agreement of February 14, 1942, and the subsequent filing of articles of incorporation, this corporation became the equitable

owner of the property which Schabelitz had conditionally agreed to convey to the corporation, is entirely unsupported. The agreement to convey on certain conditions would not, of itself, constitute an equitable conveyance. The filing of articles of incorporation was but one step in meeting the conditions and was not sufficient, of itself, to pass any equitable interest in the property. ██ The finding that the corporation then assumed control of the assets theretofore used in the business and received and disbursed funds supplied by Smith, is also without evidentiary support. While stationery may have been printed with the corporate name, and may have been "used in the trade," we are not here concerned with anyone who may have been deceived thereby. As between the parties themselves, it merely appears that for some reason which is not disclosed they delayed the completion of the corporation proceedings, and the transfer of the various assets to it in return for stock. In the meantime they continued the existing business by at least an implied mutual agreement. No attempt was made to convey anything to the proposed corporation and the parties, as individuals, continued to carry on the business. At first the money advanced and used for carrying on the business was carried in a bank account under the name of "Robert T. Smith Special" and withdrawn as needed, and later was handled through another bank account in the name of "Schabelitz Research Laboratories," with a provision that checks should be signed by any two of the three parties, Smith, Schabelitz and Gossett, as individuals. There is no evidence that during the period in question Schabelitz, or anyone else, by acts or conduct treated the property used in the business as belonging to the corporation. It appears that they all treated it merely as belonging to the business which they were conducting by mutual agreement. While the evidence indicates that these parties originally intended to complete the formation of the corporation, and that the business should eventually be conducted in that form, this is the most that appears, and even that idea was later abandoned. It clearly appears that the business was conducted in exactly the same way, both before and after the corporate idea was abandoned. There is no evidence that the amounts paid in by these parties which were paid at intervals over a period of about eight months, were paid "for corporate assets" under the two agreements, or that the amounts paid by Smith and Gossett in excess of their conditional preorganization subscriptions were on any

different basis, with respect to legality, from the prior payments made by them. Some of these payments were made before the idea of completing the corporation to carry on the business was abandoned, and some thereafter. All were made for the purpose of keeping the business going, and there is no evidence that any were made as payment for corporate assets.

While there may have been a de facto or a de jure corporation for some purposes, as the respondents contend, it not only clearly appears that no assets were turned over to that corporation but that the parties, by mutual agreement, very definitely intended to and did carry on the business during the period in question in some other form. Assuming that this was not a partnership, as established by the prior judgment in the federal court, it does not necessarily follow that the business was conducted as a corporation. While the relationship between these parties may have lacked some of the elements of a partnership, it was a joint venture in which each of them had rights and assumed obligations. (*Butler* v. *Union Trust Co.*, 178 Cal. 195 [172 P. 601].) In that case, the court said: "A joint adventure, however, is similar to a partnership, and, being of a similar nature, the right to an accounting of profits in accordance with the agreement therefor and the obligations growing out of such agreement between the parties are governed by the same rules of law. . . . Since the facts alleged and found entitled the plaintiff to an accounting for the purpose of determining what were the net profits of the venture, the fact that the agreement and transactions had between the parties did not, as found by the court, constitute a copartnership in the strict sense, is wholly immaterial." In the case before us, disregarding the findings which are unsupported by the evidence, the material facts found disclose a joint venture and called for an accounting, and the court should have so held. That accounting should cover the period from approximately February 1, 1942, to October 31, 1942, during which these parties by mutual agreement were carrying on this business together, and should include the interest, if any, of Morgan, whose exact position in the enterprise during that period does not very clearly appear in the record before us.

The judgment is reversed.

Griffin, J., concurred.

[Civ. Nos. 15119, 15120. Second Dist., Div. Three. June 11, 1946.]

Guardianship of the Person and Estate of DONNA MARIE KERNS, a Minor. RUBY LEABO, Appellant, v. MARGARET E. KELLY, Respondent.

Arthur A. Jones for Appellant.

Ira C. Doane and Everrett R. Peckham for Respondent.

SHINN, J.—Donna Marie Kerns, aged 8 years, is the daughter of Margaret E. Kelly, nee Margaret E. Kerns. Upon the petition of the mother, she was appointed guardian of the person, and Citizens National Trust and Savings Bank was appointed guardian of the estate of said minor. In the same proceeding the court denied a cross-petition of Ruby Leabo praying that she be appointed guardian of the person and estate of the minor. Ruby Leabo also filed with the superior court a petition to have the child declared free from the custody and control of her mother under the Juvenile Court Law, division 2, part I, chapter 2, article 6, Welfare and Institutions Code. Her petition was resisted by Mrs. Kelly and, after a trial, was denied. The guardianship proceeding was determined by Honorable John Gee Clark, and the abandonment proceeding by Honorable William B. McKesson, in the exercise of his jurisdiction as judge of the juvenile court. Ruby Leabo has appealed from the entire judgment made in the guardianship proceeding and also from the one in the abandonment proceeding. The appeals have been consolidated.

That portion of the judgment of Judge Clark which appointed the corporation guardian of the estate of the minor should be affirmed. The minor had an estate as beneficiary of

the will of one Grafton Leabo, no guardian of the estate had been appointed, the mother had petitioned for the appointment of the corporation, Ruby Leabo, a stranger, had petitioned for her own appointment, and the selection that was made was within the discretionary power of the court. Appellant in her brief states no reason for a reversal of that provision of the judgment.

The purpose of Ruby Leabo in prosecuting the proceeding in the juvenile court was to have the child freed from the custody and control of the mother so that she would be subject to adoption without the mother's consent. An extended hearing was conducted before Judge McKesson for the determination of a single question of fact, namely, whether the mother had abandoned her child and had thereby rendered the child subject to the jurisdiction of the juvenile court by virtue of section 701a of the Welfare and Institutions Code, which extends the jurisdiction to any child under 21 years of age "Who has been left by either or both of his parents in the care and custody of another without any provision for his support, or without communication from either or both of his parents, for the period of one year with the intent on the part of such parent or parents to abandon such person. Such failure to provide, or such failure to communicate for the period of one year, shall be presumptive evidence of the intent to abandon."

The law which governed in the guardianship matter heard by Judge Clark is section 1409 of the Probate Code, which reads: "A parent who knowingly or wilfully abandons or, having the ability so to do, fails to maintain his minor child under fourteen years of age, forfeits all right to the guardianship of such child; . . ." etc. The question of abandonment was involved in both hearings and the finding of each judge was in favor of the mother. Judge McKesson found: "That said natural mother did not fail to provide for or communicate with said minor for the period of one year with the intent to abandon said child," etc., and in the conclusions of law he further found: "That the natural mother, Margaret Elizabeth Kelly, did not abandon or intend to abandon her said minor daughter, Donna Marie Kerns, within the meaning of section 701a of the Welfare and Institutions Code, or otherwise or at all." Judge Clark found: "That said natural mother did not fail to provide for or communicate with said minor daughter for the period of one year with the intent to

abandon said minor. That said natural mother did not abandon said minor.'' However, no finding was made in the guardianship matter as to whether the mother had knowingly or wilfully failed to maintain the minor, having the ability so to do, which was a question for decision under section 1409, Probate Code. We have, then, two questions which necessitate a consideration of the evidence: First, was there evidence of a substantial character which furnished support for the two findings that there had been no abandonment and, second, was the failure to make a finding as to the alleged failure of the mother to support the child an error which necessitates a reversal of that portion of Judge Clark's judgment which appointed the mother guardian of the person of her child. These questions cannot be disposed of properly without a statement of the evidence, which consisted of a review of the mother's conduct and her circumstances, as well as the life of her daughter, from a date preceding the birth of the child.

In 1936, respondent, Margaret Kerns (Kelly), was 18 years of age and, with her younger sister, was visiting at Los Angeles, a family named Martin, friends of her own family. The father of the child was a son of the Martins, a young man who was employed and whose marriage to Margaret had been arranged. The baby was born in Denver; the mother returned to Los Angeles with her child, expecting to marry the baby's father, but the latter met his death in an accident before the marriage could take place. The mother went to work as a waitress, placed the child in good hands, and supported her. In 1937, while working in a restaurant owned by Grafton Leabo, she married him but thereafter continued to work and support the baby. The marriage was a mistake and the parties separated. The mother returned to Denver, but continued to support the daughter until September 14, 1938, when Leabo was granted letters of guardianship of the person of the minor by the Superior Court of Los Angeles. The mother at that time was ill and she continued under the care of physicians, being able to work only a part of the time, and then earning only $5.00 a week as a house servant. In 1939, Leabo, who had married Margaret without being finally divorced from a former wife, sued for and obtained an annulment of his marriage to Margaret. In 1940 Ruby entered the employ of Grafton Leabo as his housekeeper and in 1942 she married him. The child

lived with the Leabos until Grafton died, October 8, 1944. On October 11, 1944, Ruby filed a petition for her own appointment as guardian of the person of the minor, and on October 31, 1944, she filed a separate petition for her appointment as guardian of the estate. In the meantime, Margaret had married one Kelly, her present husband, who was then a W. P. A. worker. From December, 1941, until July, 1943, when he joined the Navy, Mr. Kelly held another position, in which he earned about $150 a month. The mother obtained employment in August, 1943, first at $15 a week, and other small wages, and later at about $135 a month, and thereafter she also received $50 a month of her husband's pay. While it does not appear with certainty what wages she received during the different periods, it is reasonably certain that during the greater part of the year immediately preceding the filing of her petition for guardianship she had the ability to contribute substantially to the support of the child. During all of the earlier years, while she was living in Denver, she was without ability to support the child, due largely to a serious illness.

Judge McKesson made comprehensive findings, all of which have support in the evidence. He found that prior to leaving for Colorado the mother had placed the child in the home of one Hildegarde Wenger and that the mother was supporting her and had made arrangements for the child to be returned to her; that in October, 1944, when Grafton Leabo was appointed guardian, the mother was in Denver, sick and without funds, but that she protested to the judge against Leabo's petition; that she did not thereafter attempt to have Leabo's appointment vacated because she suffered from lack of funds and feared the said Leabo, and that immediately upon learning of his death she sought her own appointment as guardian; that she did not fail to provide for or communicate with the child for a period of one year with intent to abandon the child; that she sent, or caused to be sent, Christmas presents, birthday and Easter presents each year, and that the same were received by the minor; that while he was guardian, Grafton Leabo took the child to Denver to see her mother and offered to give her back to her mother if the latter would return and live with him, but that she refused through fear of the said Leabo and asked for the return of the child; she received a series of photographs of the child which she cherished, and at least once a year, at the request of the mother, a cousin of the mother visited the child and reported as to the child's con-

dition, and the maternal grandmother, with whom the mother lived, corresponded with Leabo at least once a year and received replies, which she read to the child's mother, this continuing throughout the guardianship. It was found to be untrue, as alleged in the petition, that the mother left said minor in the care of said Ruby Leabo without support or communication, with intent to abandon said minor. The mother testified at great length in the hearing before Judge McKesson, and the testimony which she gave fully supported her own summarization, as follows: "I never have given up Donna. I have never abandoned her. I have always—I have been waiting for all these years just so I could have her, but I couldn't fight Mr. Leabo; there was just nothing I could do."

Our own study of the evidence satisfies us that the material conclusions reasonably to be drawn therefrom are the following: The child has always had a good home; at the time Grafton Leabo obtained letters of guardianship there existed an undissolved marriage relation with Margaret, and Leabo's assumption of the duty of supporting the child was voluntary and imposed upon the mother no legal duty to reimburse him for the child's support. The voluntary nature of that support was not thereafter altered by any request by Leabo that the mother contribute to the support of the child; the mother did not fail at any time in the performance of her legal duty to support the child; she did not neglect the child, nor ever lose affection for her nor show any lack of interest in her welfare. She believed at all times that her daughter would eventually be restored to her and she submitted to the arbitrary actions of Leabo because she did not know how to overcome the effect of the court order appointing the latter as guardian of the child; her continued separation from the child was not in accordance with her wishes, and her absence from Los Angeles, she testified, was due to her fear of Leabo. Promptly upon the death of Leabo, the mother asserted, and she has vigorously prosecuted, her right to the custody of her child. In short, her situation is due to extreme misfortune, and not to any failure in the performance of her legal or moral obligations, nor, in fact, to any culpable fault or neglect upon her part.

We do not see how the issue of abandonment could have been justly decided against the mother. As said in *Guardianship of Snowball*, 156 Cal. 240, 243 [104 P. 444], "In order to constitute abandonment 'there must be an actual desertion, ac-

companied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' '' To abandon means to give up a right absolutely with no intention of reclaiming it, and it must be shown by the clear, unequivocal and decisive act of the party. (*In re Kelly,* 25 Cal.App. 651, 658 [145 P. 156]; *In re Cordy,* 169 Cal. 150 [146 P. 532]; *Matter of Cozza,* 163 Cal. 514, 524 [126 P. 161, Ann.Cas. 1914A 214]; *In re Edwards,* 117 Cal.App. 667 [4 P.2d 560]; *Estate of Akers,* 184 Cal. 514 [194 P. 706].) Failure to provide or failure to communicate for a period of one year is only presumptive evidence of intention to abandon, under the Welfare and Institutions Code. Absence of any such intention was clearly established by the evidence in the hearing of the guardianship proceeding, as well as in the one held in the juvenile court.

■ A finding should have been made in the guardianship proceeding as to whether the mother had failed to maintain her daughter, within the meaning of section 1409 of the Probate Code. The omission to make such finding was error, but we are convinced that it was not an error which resulted in a miscarriage of justice or which requires a reversal for a retrial of that issue. The question is not merely whether the child was supported by the mother or by someone else. It is rather a question of what constitutes a wilful failure on the part of the parent. ■ The provision of the section which would visit upon the parent the extreme penalty of forfeiture of the right to serve as guardian has for its purpose the protection of the child from neglect, and not the mere punishment of the parent. ■ The failure to support a child, which is due to poverty or other misfortune not resulting from the wilful acts or omissions of the parent, does not deprive the parent of the right of custody or control or the right to serve as guardian. This is for the reason that there is in such circumstances no breach of legal or moral duty. There is nothing legally or morally wrong in the conduct of a parent who makes an arrangement for the support of his or her child by a relative or friend. To fail to meet the burden of support means to cast off that burden, to refuse to bear it, and to make it necessary that others should assume it. ■ Mere consent to the voluntary support of a child by others, or acquiescence in such voluntary support, is not a failure within the meaning of section 1409, *supra.* Arrangements of this character which may be of advantage to the children, and to

the other parties concerned, as well, do not result in a deprivation of parental rights. The courts have so held whenever the question has arisen, and have not hesitated to reverse judgments which have deprived parents of their natural rights by reason of erroneous conclusions as to what constitutes failure to maintain children, or abandonment. (*Matter of Forrester,* 162 Cal. 493, 496 [123 P. 283]; *In re Green,* 192 Cal. 714 [221 P. 903]. See, also, cases last above cited.) Mrs. Kelly has been separated from her daughter through misfortune, but the greatest misfortune of all, and a grave injustice as well, would have been a judgment which would have made that separation permanent. ■ The failure of the court to make a finding as to whether she had wilfully failed to maintain her daughter was not a reversible error, for the reason that a finding adverse to her upon that issue would have been without support in the evidence.

■ There is one other point to be disposed of. Ruby Leabo was appointed guardian of the person of Donna on October 31, 1944, without the giving of any notice of her petition, or order prescribing notice. The mother's address in Denver was stated in the petition. Section 1441 of the Probate Code provides that before making the appointment of a guardian, "such notice as the court or a judge thereof deems reasonable must be given to the person having the care of the minor and to such relative of the minor residing in the state as the court or judge deems proper. In all cases notice must be given to the parents of the minor or proof made to the court that their addresses are unknown, or that, for any other reason, such notice cannot be given." This requirement of notice to the parents is jurisdictional. The order of appointment was void and was subject to be set aside by the court at any time. It was, in fact, the duty of the court to vacate the order upon the mother's petition and to hear the matter de novo. (*In re Dahnke,* 64 Cal.App. 555 [222 P. 381]; *In re Pryor,* 68 Cal.App. 312 [229 P. 60].) It may also be mentioned that Ruby Leabo's first petition to be appointed guardian of the estate came on for hearing with the Margaret E. Kelly petition, and with Ruby Leabo's counterpetition, and was disposed of by the judgment of Judge Clark.

The judgments are affirmed.

Desmond, J., and Wood, J., concurred.

[Civ. No. 15106.   Second Dist., Div. One.   June 12, 1946.]

THE PEOPLE ex rel. DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF IMMIGRATION AND HOUSING, Respondent, v. M. K. MOREHOUSE, Appellant.

W. P. Butcher for Appellant.

Robert W. Kenny, Attorney General, and Carl S. Kegley, Deputy Attorney General, for Respondent.

DORAN, J.—The action herein is one to abate a nuisance and enjoin the appellant and other defendants from maintaining certain apartments in the city of Santa Barbara, in alleged violation of the California Health and Safety Code.

The alleged violations, as particularized in the complaint, include inadequate toilet and bathing facilities, filthy and insanitary conditions, inadequate ventilation and air space, leaky plumbing and gas pipes, sleeping in kitchens, defective and unsafe stairways, walls, floors, fixtures, etc. The property involved consists of a two story frame building at 1127 Chapula Street contining seven apartments on the first floor and seventeen apartments on the second floor; a two story frame building at 1123 Chapula Street with four apartments on the first floor and three apartments on the second floor; and Parcel C, "known as one story frame structures at rear of and connected to No. 1123 and No. 1127 Chapula Street, containing two single sleeping rooms and 12 apartments." The appellant testified that she had owned and operated the apartments for about thirty-five years. Several photographs were introduced in evidence showing the interior of various apartments and alleged defective conditions, the photographs being identified by the appellant.

The complaint was filed on May 2, 1945, appellant filed a demurrer thereto, but no answer, and on May 15, 1945, the demurrer and an order to show cause *in re* a preliminary injunction, were heard together, and the demurrer overruled. Thereafter, the trial court heard evidence in reference to the preliminary injunction, including appellant's testimony; certain stipulations in open court were entered into, and a preliminary injunction granted. Testimony was also received from John Frederick Murphy, an architect who had inspected the Morehouse property; from Dr. Roome, physician and city health officer; and from Buren Thorleifson, state housing inspector. In answer to the court's inquiry whether appellant wished to produce any evidence, appellant's counsel stated, "No, your Honor; in the light of what my client has stated on the stand, that she intends to put in some additional toilets and baths, I will concede that point so far as any order of the Court it may make; . . . toilets, baths and the cooking we are willing to proceed and whatever repairs may be necessary on the stairway to make that comply with the State statutes. . . . I will stipulate that an order may be made as to those features." The record then reveals the following:

"THE COURT: That takes care of everything then, except the partitions.

"MR. KEGLEY: Well, there are numerous citations, so to

speak, listed as corrections for the defective plumbing under certain sinks and wash basins.