[Crim. No. 12335. Second Dist., Div. One. July 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID DEAN SIPLINGER, Defendant and Appellant.

Herbert E. Selwyn, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal by David Dean Siplinger from a judgment of conviction on one count of first degree murder (Pen. Code, § 187) and two counts of assault with a deadly weapon with intent to commit murder (Pen. Code, § 217). Appellant pleaded not guilty and not guilty by reason of insanity, but the jury found him guilty as charged and sane on the date the offenses charged were committed. The death penalty was not requested by the prosecution. Appellant's motion for a new trial or for a reduction of the murder conviction to second degree was denied. Siplinger was denied probation and was sentenced to state prison on each count as prescribed by law, the counts to run concurrently.

Appellant contends that the court erred in deleting a portion of the manslaughter instruction, in denying appellant's motion to reduce the degree of the murder conviction, and in permitting a gun never introduced into evidence to be exhibited before the jury without a proper admonition. These contentions are without merit.

The facts, as related by eyewitnesses, disclose that Ann Sugarmeyer met Siplinger at the home of her sister a year or so before the crime. Several months later Ann moved to Reno, Nevada, where she lived with Siplinger intending to obtain a divorce so that they could be married. This plan was not fulfilled, however, and they returned to Los Angeles together in November 1964. When Ann left him in January 1965, Siplinger threatened to kill Ann and her family and take away her three-year old son. Ann was pregnant with Siplinger's child, but she was working to support herself and her son. Siplinger attempted to cause Ann trouble at her place of employment, wrote letters to her employer attempting to have her discharged and occasionally tried to follow her home so that Ann several times reported him to the police.

Ann had two sisters: Dorothy Stephens, who resided at 613

Grant Street in Santa Monica and Edith Thompson who lived in northern California but was visiting the Stephens family when the crime took place. Their mother, Ruth Vincent, lived in a room behind Dorothy's home.

On July 25, 1965, Ruth visited Ann in the afternoon and they then decided to return to Dorothy's home for a talk. Ruth drove and Ann's son sat between them on the front seat of the car. Siplinger, who was determined to talk to Ann that day, found them and followed them down Wilshire Boulevard and over to Dorothy's home. A couple of times he attracted their attention and shouted that he wanted to talk to Ann, but she refused saying that he must first speak to Dorothy and Joe Smith, who was then living with Dorothy.

When they reached Dorothy's house, Ruth stopped the car and told Ann that she should get into the house as fast as she could while Ruth would take her son around and bring him in the back door. Ann jumped out of the car and hurried toward the house but Siplinger parked his car in the middle of the street, took a gun from the glove compartment, and ran after her. Ann turned when he called her name and suddenly saw him standing on the sidewalk pointing a gun at her. She heard one shot and ran into the house, stumbling over a board set up to confine Dorothy's baby, and fell into the kitchen.

Ann's sisters were in the breakfast room drinking coffee when the noise outside attracted their attention. Dorothy got up and ran for the front door. Ruth, who was still in the car, saw Siplinger get out of his car with a gun in his hand and advance upon Ann, calling her name. After Ann turned around, Ruth tended to Ann's son, but she heard two shots and, looking up, she saw her daughter Dorothy leave the house and fall on the doorstep. Ruth immediately stopped her car and jumped out. She advanced on Siplinger, who was standing near his car, and he pointed the gun at her but she continued to approach. He shot her once in the arm when she was about 20 feet away and when she failed to stop, he shot her a second time in the chest. When she was hit the second time, Ruth turned back toward the house with the thought in mind to get help for Dorothy, who was lying at the foot of the front steps. She tried to reach the telephone but fell in the middle of the living room. Meanwhile, Siplinger got into his car and fled.

The Lindstroms, who lived in an apartment next door to the Stephens' residence, heard shots and went outside to investigate. Mr. Lindstrom first looked from the window and saw

Siplinger, whom he later positively identified, standing with a pistol held in both hands shooting towards the victims. When he went outside he found Dorothy Stephens lying on the steps and ran back home to call the police. His wife went to Dorothy's aid and Dorothy told her, ''I have been shot. I know who shot me. . . . It was Dave Siplinger. . . . I am dying.'' Dorothy Stephens died soon thereafter from a gunshot wound in the chest which perforated the right lung and caused a massive hemorrhage.

Siplinger testified in his own defense. He, at first, claimed he purchased the gun about a week and a half before the crimes for target practice, but confessed he never used it for that purpose. Later, he testified that he also purchased the gun for protection from Joe Smith. Siplinger claimed he had been threatened by Joe, both directly and through others. He knew Joe had a gun which he always carried with him at night to the service station where he was employed and occasionally at other times. Joe, however, testified that the gun which was registered in Dorothy's name had been purchased by her as a gift for him. It was kept in the headboard of a bed at their home and Joe never carried it to the station because there was a strict policy prohibiting firearms. Moreover, he had never threatened appellant with a gun. Once when Siplinger filed an action against Ann, Joe accompanied her to court and after the case was dismissed Siplinger said he would get them all some way, sometime. Joe then promised to whip him if ever he interfered with the family and rebuked him for threatening women.

Siplinger further testified that on July 25th he blacked out after taking some clothes to the laundry and remembered nothing more until 10:30 p.m. that evening when he became aware that he was at the home of a friend and an officer was telling him he was under arrest. However, in his admissible statements to the police made shortly after the shooting, he said that he had taken the gun out of the glove compartment, had gotten out of the car and followed Ann to the house. Although he was upset and nervous, he made no mention then of an earlier period of unconsciousness that day. He stated that he had spent some time in a mental institution in 1958 after a period of some type of unconsciousness and had then attempted to commit suicide in a fit of depression over a woman. He also had visited a doctor during the spring of 1956 to obtain medication for his nerves after Ann left him, and on July 25th he had taken prescribed tranquilizers to stave off nervousness

and trembling. He felt hostile toward Ann at that time because, although he loved her, she wouldn't let him see her or her son and he felt he would not be allowed to see the child of his which Ann was carrying. He admitted that he had attempted to have her discharged because he wished to hurt her as she had hurt him. He was hostile toward Ann's mother as well because, while he was living with Ann, Ruth several times had argued with him about the method of rearing Ann's son and he felt that Ruth was partially responsible for the separation.

Three psychiatrists reported independently that they could observe no organic reason for interference with Siplinger's memory on July 25th and felt that he was then acting consciously. Electroencephalogram test results were normal.

 Siplinger contends that the court erred in deleting portions of the instruction which distinguished manslaughter from murder[1] because this prevented the jury from considering appellant's defense that during a period of unconsciousness he committed a misdemeanor in violation of Penal Code, section 417, which provides:

"Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, . . . in a rude, angry or threatening manner, . . . is guilty of a misdemeanor."

This section is inapplicable to the facts since no misdemeanor was charged, there is no evidence that Siplinger "drew" or "exhibited" the gun in a "rude, angry or threatening

---

[1] "Manslaughter is distinguishable from murder principally in this: That though in manslaughter the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is an essential element of murder, is wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient.

"When the mortal blow, though unlawful, is struck in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter. In such a case, even if an intent to kill exists, the law deems that malice, which is an essential element of murder, is absent.

"[If a person while committing a felony causes another's death, malice is implied, and the crime is murder. If while committing a misdemeanor he causes another's death, there is no malice, and he is guilty only of manslaughter.]

"[There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing such a dangerous act in an unlawful or criminally negligent manner, without realizing the risk involved, he is guilty of manslaughter. If, on the contrary he had realized the risk and acted in total disregard of the danger to life involved, malice would be implied and he could be guilty of murder.]"

manner'' and it is not a lesser included offense in this case. Siplinger withdrew the gun from the glove compartment of his car, advanced upon Ann calling her name, and when she turned deliberately shot at her. He missed and killed Dorothy. Thereafter when Ruth approached him he shot at her and wounded her twice. He was imbued with malice towards the entire family as evidenced by threats he made to Ann when she left him and to Joe Smith at a later meeting with the family. It is not error to refuse an instruction which is not supported by the evidence. (*People* v. *Jones,* 184 Cal.App.2d 464, 469 [7 Cal.Rptr. 424].) This was clearly not a killing in the course of a misdemeanor, but in the course of the other felonies of which Siplinger was convicted: two counts of assault with a deadly weapon with intent to kill. The misdemeanor described by Penal Code section 417 ''. . . is not included in a charge of assault with intent to murder, and therefore on a trial on an information charging the latter offense, the court may properly refuse to charge the jury upon the subject matter of section 417 of the Penal Code. (*People* v. *Piercy,* 16 Cal. App. 13 [116 P. 322].)'' (*People* v. *Diamond,* 33 Cal.App.2d 518, 522-523 [92 P.2d 486]; *People* v. *Jones, supra,* p. 469; *People* v. *Zilbauer,* 44 Cal.2d 43, 51 [279 P.2d 534].)

The California Supreme Court recently determined that the trial court's failure to instruct the jury concerning the terms of Penal Code section 417 may constitute reversible error under certain conditions not herein present. (*People* v. *Wilson,* 66 Cal.2d 749 [52 Cal.Rptr. 156, 427 P.2d 820].) In that case Wilson did not deny committing the homicides but interposed by his own testimony two defenses to first degree murder: (a) that he was unconscious at the time he killed his victims, and (b) that the crimes did not constitute felony murder because when he forcibly entered his estranged wife's apartment, gun in hand, his intent was to scare rather than assault the occupants. He testified that he became unconscious of his conduct only after he was left in the dwelling alone with the two victims whom he ultimately killed. The trial court rejected the requested instructions concerning unconsciousness and Penal Code section 417 instructions were apparently neither submitted nor considered. Wilson's testimony with respect to the absence of an initial intent to kill was, however, supported by the fact that he permitted one of the occupants to leave the apartment unmolested and fired at two of the others in what he considered to be merely self-defense. (*People* v. *Wilson, supra,* p. 757.)

In the instant case Siplinger testified that he blacked out well before the criminal episode and, unless his defense of unconsciousness were believed, all other evidence indicated a maliciously intentional assault. Siplinger made no claim to innocent intentions and the jury, adequately instructed on the subject of unconsciousness and retrograde amnesia, rejected that defense and found him guilty not only of first degree homicide, but of two counts of assault with a deadly weapon with intent to kill. Under these circumstances the absence of Penal Code section 417 instructions, even were these considered applicable, could have had no effect on the verdict and were not prejudicial. Our position is confirmed by the *Wilson* decision wherein the court rejected the same grounds for reversing the assault conviction as to one victim who was merely injured when Wilson shot in "self-defense" because Wilson "did not claim that he shot at . . . [the victim] to scare him nor . . . that he was unconscious at the time of that shooting." (*People* v. *Wilson, supra,* pp. 764, 765.)

The jury was fully instructed on the defense of unconsciousness or retrograde amnesia and on the subject of voluntary manslaughter. The jury was informed that manslaughter was a necessarily included crime and that it should return a verdict on the lesser included offense if in doubt as to the crime of which Siplinger was guilty. The jury, which was properly and adequately instructed, weighed the evidence and discarded appellant's defense of unconsciousness.

Appellant next mistakenly contends that the court should have reduced the charge to second degree murder because there was insufficient evidence of premeditation and deliberation and only the "wildest circumstantial evidence" and the victim's dying declarations were adduced to connect appellant with the crime. Appellant is mistaken. The uncontroverted direct evidence obtained from eyewitnesses was that appellant drove up, parked his car in the street, stepped out of his car with his gun in his hand, and deliberately fired at Ann. Ann escaped injury by running into the house, but Dorothy came out just then and was fatally shot. The girls' mother, who approached appellant in an attempt to protect them, was shot twice in clear view of eyewitnesses, each of whom later identified appellant as the person who did the shooting and then took flight in his car.

The jury acted within its province to reject appellant's explanation of the shooting and his possession of the gun. They were justified in inferring from his prior threats and his be-

havior on the day of the shooting that he bought the gun to implement his plan for revenge. The events immediately preceding the shootings demonstrate appellant's hostility and his intent to inflict physical harm on Ann and her family. He followed their car even though Ann told him she would not talk to him and when her mother stopped to let Ann out, he stopped his car also and shot at her while she was on her way to the house. Whether he deliberately intended to kill Ann's sister, Dorothy Stephens, or whether she was hit by a shot intended for Ann, the circumstances compel the conclusion that the crime was murder in the first degree. Appellant could not reasonably contend that the shots fired at Ann and her mother were not premeditated and deliberate. ■ As to the homicide of Dorothy Stephens, the doctrine of transferred "intent" applies ". . . [u]nder that doctrine when a person purposefully attempts to kill one person but by mistake kills another instead, the law transfers the felonious intent from the object of the assault to the actual victim. [Citations.] . . . 'In other words, the crime is exactly what it would have been if the person against whom the intent to kill was directed had been in fact killed.' " (*People* v. *Clayton,* 248 Cal.App.2d 345, 349-350 [56 Cal.Rptr. 413].)

The prosecution did not offer appellant's gun into evidence because of a potential search and seizure issue which they wished to avoid; ballistics evidence was inappropriate because the gun was not offered. Appellant asserts that it was error for the court to permit the prosecution to exhibit the gun before the jury during examination of prosecution witnesses and then withdraw it from their further inspection without admonishing the jury to disregard the gun. ■ An appellate court is limited to a consideration of matters contained in the record of the trial proceedings. (*People* v. *Roberts,* 182 Cal.App.2d 431, 438 [6 Cal.Rptr. 161] ; *People* v. *English,* 249 Cal.App.2d 70, 73 [57 Cal.Rptr. 126] ; *People* v. *Merriam,* 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161].)

■ The record discloses that the gun was on the counsel table in view of the jury during the early stages of the trial and until the *voir dire* of the police officers with reference to the search and seizure issue. Although the court determined the search and seizure issue in the prosecution's favor, the prosecution nonetheless prudently decided to withhold the gun from evidence. The gun was then removed from the counsel table during a jury recess with the approval of defense counsel, who assured the court that he would not move for a

mistrial thereupon. We conclude that the display of the gun was not, in any event, prejudicial. ■ Evidence resulting from a search incident to a lawful arrest or obtained in "hot pursuit" of the principal suspect is admissible. (*Warden, Maryland Penitentiary* v. *Hayden,* 386 U.S. 903 [18 L.Ed.2d 782, 87 S.Ct. 1642], decided May 29, 1967.)

■ Officer Nedelcove on *voir dire* testified that on July 25, 1965, he received information that a shooting and possible homicide had taken place at 613 Grant Street in Santa Monica and that the suspect, identified as Siplinger, had left a vehicle in the 400 block of Hollister where it was under observation. Nedelcove immediately located the car under the observation of Officer Crabbe, verified the license plate and observed that the radiator was still warm. Appellant was not in sight. Nedelcove found no registration; he checked the glove compartment and came upon an envelope bearing Siplinger's name and address. When he searched the car he found the gun under the driver's seat and preserved it for evidence; the automobile was impounded. Although appellant was not present and did not consent, the officer had no search warrant, and the search was not incident to Siplinger's arrest, it clearly occurred in the course of "hot pursuit." It would have been imprudent for the officers to fail to make such a search for weapons under the circumstances. (*Gouled* v. *United States,* 255 U.S. 298, 309 [65 L.Ed. 647, 652, 41 S.Ct. 261].)

The gun was neither identified nor singled out for the jury's consideration, and we find no prejudice in the conduct of the prosecution with respect to the weapon or otherwise.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 23, 1967.