[Crim. No. 9412. Third Dist. Apr. 17, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
ANITA MATHEWS, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, Laurance S. Smith and Tom Lundy, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EVANS, J.**—Defendant, Anita Mathews, appeals from a judgment entered following her conviction of the voluntary manslaughter[1] of Donald Silva (Pen. Code, § 192), and discharging a firearm at a vehicle (Veh. Code, § 23110, subd. (b)), as charged in count two. The jury also found defendant used a firearm within the meaning of Penal Code section 12022.5 during the commission of both crimes. Defendant was acquitted of the attempted murder of Darelle Ghormley, as charged in count three.

The charges against defendant arise from an incident occurring on December 13, 1976, in which defendant, while unsuccessfully attempting to kill Darelle Ghormley, fatally injured Donald Silva.

The record discloses defendant and Ghormley had dated on two or three occasions in November 1976. Their activities were mostly limited to Ghormley visiting defendant at her house where he had sexual relations with her. Ghormley testified that on the last of these dates, he took defendant to his house where he and two friends had sexual intercourse with her.

On the day of the fatal shooting Ghormley, a passenger in a car driven by decedent Donald Silva, had occasion to stop at defendant's house. Defendant, with the assistance of Joe Waters, was in the process of moving out of the house; as defendant and Joe Waters were walking to

---

[1]Defendant Mathews had been charged with murder (Pen. Code, § 187) as was codefendant Joe Waters; Waters was acquitted of all charges.

Waters' car, she observed Ghormley in a car driven by Silva. Upon recognizing Ghormley, she momentarily froze, but quickly returned to Waters' vehicle. Ghormley had heard rumors that defendant had publicly accused him of having raped her; and when he saw defendant, he asked Silva to leave in order to avoid any possible trouble.

Defendant returned to Waters' car and declared, " '[t]hat's him' " and told Richard Grigg, a passenger in the Waters' car, to get out. Defendant and Waters then got into Waters' car and pursued the Silva vehicle. When Silva stopped at a red light, the Waters' vehicle drove alongside on Silva's passenger side. Ghormley testified that he noticed a shotgun extending through the vent window on the driver's side of the Waters' automobile and told Silva, " 'They got a gun, jump on it' " and then ducked onto the floor, and heard successive gunshots and felt pieces of glass and buckshot in the back of his hair and along his neck. After the shots Ghormley looked up and observed that Silva had suffered what turned out to be fatal head injuries.

Defendant's version of the incident was somewhat different. She testified that after seeing Ghormley, she wanted to leave, but that Waters insisted on following Ghormley's car; and as Waters pulled alongside the other car, Ghormley began rolling down the car window and pointed a gun at her. Waters' testimony confirmed the existence of Ghormley's gun.

Following the shooting, defendant and Waters were apprehended in Truckee, California. After her arrest defendant gave a statement to Sacramento County Sheriff's detectives in which she admitted socializing with Ghormley, but denied she had been raped by Ghormley, or that he had stolen drugs from her, or that she had shot at anyone.

At trial defendant admitted the act of killing Silva. Her defense to the charges centered around her contention that the sexual incident in November 1976, involving Ghormley and his two friends, was not a consensual act but was instead a brutal rape, following which she suffered what was characterized as a "rape trauma syndrome." Upon this premise, she introduced psychiatric testimony tending to prove that when she saw Ghormley at her house, the "rape trauma syndrome" caused her to experience a genuine fear for her life, precipitating her subsequent actions. The psychiatric testimony also attempted to establish that as a result of the syndrome, defendant was unable to form the mental state necessary for malice aforethought.

On appeal defendant first contends the trial court should have instructed the jury *sua sponte* that a homicide is justified under the doctrine of self-defense where the act of self-defense, though directed towards the unlawful aggressor, inadvertently results in the death of an innocent bystander.

Preliminary to any analysis of whether the court has a duty so to instruct *sua sponte* is the question of whether that defense, under present circumstances, is even available. Research has disclosed no California case directly dealing with this issue.[2] However, considered decisions of other jurisdictions have uniformly held that self-defense is available to relieve one of criminal responsibility where his legitimate act of self-defense results in the inadvertent death or injury of an innocent bystander. (See e.g. Annot. (1974) 55 A.L.R.3d 620 and cases cited.)

Generally, decisions so holding rest upon the common law theory of "transferred intent" which, in its principal application, establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences. As the noted cases have held, the reasoning applies equally to carry the *lack of criminal intent* to the unintended consequences and thus preclude criminal responsibility. The theory was explained in *State* v. *Clifton* (1972) 32 Ohio App.2d 284 [61 Ohio Ops.2d 439, 290 N.E.2d 921, 923], as follows: "Clearly, one who kills in self-defense does so without the *mens rea* that otherwise would render him culpable of the homicide. Therefore, if the act of taking the life of an assailant is not criminal does it become so when a stray shot kills a bystander?

"It has been long accepted that if A shoots at B, intending to kill B, but instead the bullet strikes C, then A has committed a criminal act as to C. In such instance, the 'malice follows the blow' and the criminal intent of A to harm B is transferred to C.

"However, if A had no criminal intent with respect to B, as where A is exercising a lawful right to self-defense, none could exist as to C. It

---

[2]The People's reliance upon *People* v. *Carson* (1946) 74 Cal.App.2d 834, 841 [169 P.2d 677], is misplaced.

In *Carson* the defendant *intentionally* struck the victim attempting to get her out of his way. so that he could defend against the assault being perpetrated upon him by the victim's sons. It is no authority for the situation where, as here, the act is directed towards the unlawful aggressor and *inadvertently* results in the injury of a nonaggressive party. Similarly distinguishable, although not cited by the People, is *People* v. *Martin* (1910) 13 Cal.App. 96 [108 P. 1034].

follows, then, that A in shooting C has not committed a criminal act, the essential of a *mens rea* being impossible of proof. The inquiry must be whether the killing would have been justifiable if the accused had killed the person whom he intended to kill, as the unintended act derives its character from the intended."[3]

The common law doctrine of transferred intent is recognized and followed in California. (*People* v. *Suesser* (1904) 142 Cal. 354, 366-367 [75 P. 1093]; *People* v. *Carlson* (1974) 37 Cal.App.3d 349, 357 [112 Cal.Rptr. 321]; *People* v. *Siplinger* (1967) 252 Cal.App.2d 817, 825 [60 Cal.Rptr. 914]; *People* v. *Clayton* (1967) 248 Cal.App.2d 345, 349 [56 Cal.Rptr. 413]; see 1 Witkin, Cal. Crimes (1963) Elements of Crime, § 61, p. 65.) We find nothing within the provisions of Penal Code section 197,[4] which codified in California the law of justifiable homicide, to preclude application of "transferred intent" to self-defense circumstances. Indeed, it has been held that section 197 codifies the common law and should be construed accordingly. (*People* v. *Ceballos* (1974) 12 Cal.3d 470, 478 [116 Cal.Rptr. 233, 526 P.2d 241]; *People* v. *Jones* (1961) 191 Cal.App.2d 478, 481 [12 Cal.Rptr. 777].) By reason of the foregoing cited authorities and analyses, we conclude that the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander.

We turn next to the question of whether under the facts of this case the court had a duty so to instruct *sua sponte.*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles *closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.*' " (Italics added; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], quoting from *People* v. *St.*

---

[3]See also LaFave & Scott, Handbook on Criminal Law (1972) page 259; Perkins, Perkins on Criminal Law (2d ed. 1969) page 824.

[4]Penal Code section 197, as applicable to the instant case, provides in pertinent part:

"Homicide is also justifiable when committed by any person in any of the following cases:

"1. When resisting any attempt to murder any person, . . . or to do some great bodily injury upon any person;

"

"3. When committed in the lawful defense of such person, . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger to such design being accomplished; . . ."

*Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 228 [137 Cal.Rptr. 171, 561 P.2d 261].) ■ Thus, while the duty extends to an obligation to instruct on defenses, including self-defense (*ibid.*; *People* v. *Sedeno, supra,* 10 Cal.3d 703), "A trial court is not, absent a request therefor, required to instruct on specific points developed out of the particular facts presented at trial." (*People* v. *Enriquez, supra,* 19 Cal.3d at p. 228.) Expressed another way, the court has no duty to instruct on points of law not relied upon by either the prosecution or the defendant and which, when placed in the context of the developments at trial, were inconsequential to a proper resolution of defendant's guilt.

Here, defendant's major emphasis at trial was directed towards her defense based upon the "rape trauma syndrome." Significantly, the prosecution did not contest the applicability of the "syndrome," either to diminished capacity or self-defense, but instead asserted the facts proved defendant was the intentional aggressor. Thus at trial, neither party contested the issue of whether defendant's perceived fear for her life was available to insulate her from liability for the death of Silva, an innocent third party. Each party assumed that it was. Moreover, the court gave a full complement of standard instructions dealing with self-defense, sufficient for the jury to resolve the issue of defendant's reasonable apprehension of loss of life or great bodily injury and her reaction thereto. Extracting portions of the court's instructions out of context, defendant asserts the instructions given, if followed, would preclude application of the self-defense doctrine. In particular, defendant cites CALJIC No. 5.13 for the proposition that to qualify as a justifiable homicide, the "person killed" must have been the unlawful aggressor. To the contrary, the instruction merely advises that homicide is justified when the unlawful aggressor is the person killed. It does *not* state that homicide is *unjustified* where the unlawful aggression of one results in the inadvertent death of another. Moreover, that court did instruct (CALJIC No. 5.30) that "[i]f the right of self-defense exists, it is a complete defense to any crime committed during the exercise of the right." We fail to find a duty to instruct *sua sponte* as suggested.

■ Defendant next contends the court erroneously failed to instruct on the doctrine of accidental homicide.[5] As in *People* v. *Ogg* (1958) 159

---

[5]The doctrine of accidental homicide is codified in Penal Code section 195 which provides in pertinent part: "Homicide is excusable in the following cases: [¶] 1. When committed by accident and misfortune, . . . in doing any . . . lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent."

Cal.App.2d 38 [323 P.2d 117], there are two answers to this contention. First, defendant failed to request such an instruction be given and the court was under no duty to do so *sua sponte*. (*Id.*, at p. 52.) Second, and perhaps most importantly, the facts before the jury were totally insufficient to support a theory of accidental death; even were defendant's version of the incident totally believed, it still remained unquestioned that the death of Silva was the result of defendant's *deliberate* attempt to shoot and kill Ghormley. (*Id.*, at p. 53.) We fail to find error.

■ Defendant's third contention is that her acquittal of the attempted murder of Ghormley requires reversal of her voluntary manslaughter conviction. She bases her argument upon the theory that implicit within the not guilty verdict of the attempted murder is a finding that defendant harbored no criminal intent toward Ghormley. Thus, the argument continues, the total lack of criminal intent towards Ghormley precludes the jury from finding the requisite criminal intent for the voluntary manslaughter of Silva.

Attempted murder as charged in count three requires as an element the intent to murder (*People v. Adami* (1973) 36 Cal.App.3d 452, 455 [111 Cal.Rptr. 544]), which requires a state of mind referred to as "malice aforethought." (Pen. Code, § 187; *People v. Conley* (1966) 64 Cal.2d 310, 320 [49 Cal.Rptr. 815, 411 P.2d 911]; *People v. Heffington* (1973) 32 Cal.App.3d 1, 11 [107 Cal.Rptr. 859].) Voluntary manslaughter, however, is defined as "the unlawful killing of a human being, *without malice.*" (Italics added; Pen. Code, § 192.) The verdicts in the case at bench are entirely consistent with the conclusion that the jury found that defendant acted with an intent to kill (hence the conviction of voluntary manslaughter), but without malice.

■ Defendant next contends the court erred in failing to instruct that the crime of voluntary manslaughter requires the concurrence of the criminal act and the specific intent to kill. Again, we disagree.

It is true that voluntary manslaughter is a specific intent crime requiring the concurrence of act and intent. (*People v. Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892]; *People v. Germany* (1974) 42 Cal.App.3d 414, 418-419 [116 Cal.Rptr. 841].) It is also true that the trial court did not give a separate instruction upon the concurrence of these elements. However, the instructions given adequately advised the jury of the requirement of concurrence of act and intent. The court instructed that voluntary manslaughter is an intentional killing (CALJIC

No. 8.41), and that if no such intent exists, the killing is at most involuntary manslaughter (CALJIC No. 8.48). More importantly, pursuant to the instruction on diminished capacity the jury was told that if defendant lacked " . . . intent to kill at the time the alleged crime was committed, you cannot find her guilty of either murder or voluntary manslaughter." (CALJIC No. 8.77.) While not set forth in a separate instruction, those instructions were sufficient to apprise the jury of the fundamental principles which must be found in order for them to return a knowledgeable verdict on the lesser included crime of voluntary manslaughter.

■ Finally, we reject defendant's contention that the court improperly instructed the jury that it could consider defendant's consciousness of guilt, as evidenced by her flight from the scene of the crime and her suppression of evidence and false statements, as tending to prove her guilt. An instruction on flight is specifically authorized by Penal Code section 1127c, and its use had been judicially upheld by both the Court of Appeal and the California Supreme Court. (*People* v. *Cannady* (1972) 8 Cal.3d 379, 391-392 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Burden* (1977) 72 Cal.App.3d 603, 620-621 [140 Cal.Rptr. 282]; *People* v. *Marchialette* (1975) 45 Cal.App.3d 974, 982 [119 Cal.Rptr. 816].) Additionally, instructions on suppression of evidence and uttering false statements are proper as tending to demonstrate a consciousness of guilt (CALJIC Nos. 2.06, 2.03); moreover, those instructions have been approved for use in crimes involving specific intent. (See *People* v. *Marchialette, supra,* 45 Cal.App.3d at p. 982 (flight); *People* v. *Cooper* (1970) 7 Cal.App.3d 200 [86 Cal.Rptr. 499]; *People* v. *Showers* (1968) 68 Cal.2d 639, 643 [68 Cal.Rptr. 459, 440 P.2d 939] (false statement); *People* v. *Wong* (1973) 35 Cal.App.3d 812, 831 [111 Cal.Rptr. 314].) The use of such evidence by the jury is proper when used to assist in the determination of guilt or innocence. Use of evidence of flight, suppression of evidence, and making false statements in light of the given instructions does not expressly invite jury consideration of the defendant's mental state (specific intent). If a defendant desires more specific instructions on the question of intent, he or she should request them. Furthermore, in this instance, it defies logic and common sense to assume the jury's rejection of defendant's malice and intent to kill (Ghormley) turned on consciousness of guilt. The overwhelming evidence dictates to the contrary. Defendant's reliance upon *People* v. *Anderson* (1968) 70 Cal.2d 15, 32-33 [73 Cal.Rptr. 550, 447 P.2d 942], is misplaced, as that case rejected the use of consciousness of guilt as substantial evidence to uphold a finding of premeditated murder. It has no application where, as

here, the instruction was given as an aid for determining the threshold question of guilt or innocence.

The judgment is affirmed.

Puglia, P. J., concurred.

**REYNOSO, J.**—I dissent. The majority correctly conclude that the doctrine of "transferred self-defense" is the law in California. Their further conclusion that the court had no *sua sponte* duty to instruct is unconvincing. It is understandable that the trial court did not properly instruct; after all, it is by this opinion that we enunciate applicable law. Nonetheless, the trial court did not properly instruct, and, as I read our state's decisional law, we must reverse.

The gravamen of the defense was the "rape trauma syndrome" caused by a gang rape. The record discloses the dehumanizing ordeal defendant Mathews experienced. On the day of the rape she had accompanied Ghormley to his home. Once there, Ghormley and two of his friends forced Mathews to disrobe. She begged Ghormley, a person in whom she had had confidence, not to permit such acts. His response was to laugh; the response of one of his friends was to strike her in the mouth. During the trauma, lasting approximately six and one-half hours, defendant's life was threatened; she was forced to perform acts of oral copulation; she was sodomized; and acts of sexual intercourse were performed against her will. The three men participated. At the end, she was deposited on the street near her home. When a friend took her home, she was hysterical and confused; she was vomiting; and she was suffering from a swollen lip and jaw. Some weeks later, after the rape, defendant saw Ghormley, one of the rapists. The continuing "rape trauma syndrome" caused by the gang rape was of such intensity she had an overwhelming fear. Believing that Ghormley was armed and fearing for her life, she shot at him. By misfortune she hit and killed Silva, an innocent party.

Several instructions were read to the jury relating to self-defense. But did the court's self-defense instructions give clear guidance to the jury that an act of self-defense as to Ghormley was also self-defense as to Silva (by the process of transferred self-defense)? I believe not.[1]

---

[1] Among the instructions given were (1) a modified CALJIC No. 5.12 (Justifiable Homicide in Self-Defense); (2) a modified CALJIC No. 5.15 (1977 rev.) dealing with the

Those instructions, absent an instruction on transferred self-defense, left the jury without guidance. They were confusing, if not misleading. CALJIC No. 5.13, for example, seems to proscribe the application of the transferred self-defense doctrine. It reads:

"Homicide is justifiable and not unlawful when committed by any person in the defense of herself if a reasonable person in a like situation would believe that *the person killed* intended to commit a forcible and atrocious crime and that there was imminent danger of such crime being accomplished. A person may act upon appearances whether such danger is real or merely apparent." (Italics added.) The instruction refers to "the person killed" as the one who intended to commit a crime against the person acting in self-defense.

I turn to the question of whether the trial court had a *sua sponte* duty to instruct. The appropriate test is outlined in *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]. The rule is: the trial court must instruct on general principles of law relevant to the issues raised by the evidence. This includes those principles closely and openly connected with the facts before the court which are necessary for the jury's understanding of the case. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 715.) The defense theory was that defendant Mathews acted in self-defense and mistakenly shot Silva. While the emphasis at trial was placed on the "rape trauma syndrome," a partial defense based on diminished capacity, self-defense was clearly a principle defense. Such a defense was "closely and openly" connected with the facts of the case. The transferred intent instruction was necessary for the jury's understanding of the case; absent the appropriate instruction, the jury could not evaluate self-defense as it applied to Silva, the nonaggressor. The facts of this case and the theory of defense appear to fall squarely within the *Sedeno* teachings. Accordingly, I would reverse.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1979.

---

prosecutor's burden in a justifiable homicide defense; (3) a modified CALJIC No. 5.13 (1974 rev.) dealing with Justifiable Homicide—Lawful Defense of Self or Another; (4) modified CALJIC No. 5.16 (Forcible and Atrocious Crime—Defined); (5) modified CALJIC No. 5.50 (Self-Defense, Assailed Person Need Not Retreat); and (6) CALJIC No. 5.55 (Pleas of Self-Defense May Not Be Contrived).