Filed 12/23/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION
COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br>    v.<br>CHARLES KENNETH WAXLAX,<br>    Defendant and Appellant. | E074347<br><br>(Super.Ct.No. INF1600362)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br>[NO CHANGE IN JUDGMENT] |

_____

The petition for rehearing is denied. The opinion filed in this matter on December 9, 2021, is modified as follows:

In the first sentence of the last paragraph on page 13, add the words "base term" before the word "punishment" so that the sentence reads as follows:

On balance, given the history of section 245, the legislative history of the 2011 amendment, and the fact that force-likely and deadly weapon assault carry the same base term punishment, we conclude they are different statements of the same offense when they are based on the same criminal act.

Except for this modification, the opinion remains unchanged. The modification does not affect a change in the judgment.

CERTIFIED FOR PUBLICATION

SLOUGH_____
J.

We concur:


McKINSTER_____
         Acting P. J.


MENETREZ_____
                J.

cc:    See attached list

1

MAILING LIST FOR CASE: E074347
The People v. Charles Waxlax


Superior Court Clerk
Riverside County
P.O. Box 431 - Appeals
Riverside, CA 92502


Paige Boulton Hazard
Office of the State Attorney General
P.O. Box 85266
San Diego, CA 92186-5266


Howard C. Cohen
Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA 92101-2936


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396

Filed 12/9/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074347 |
| v. | (Super.Ct.No. INF1600362) |
| CHARLES KENNETH WAXLAX, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. James S. Hawkins, Judge. Affirmed in part; vacated in part.

Richard Power and Howard Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

During an altercation outside a bar after last call, Charles Waxlax stabbed Erik Kimbler in the back with a military-grade knife. Kimbler suffered serious injuries but survived. At trial, the jury rejected Waxlax's claim of self-defense and convicted him of the four crimes the prosecution had charged him with—attempted murder, assault with a deadly weapon, assault with force likely to produce great bodily injury, and attempting to dissuade a witness from reporting a crime. The trial judge sentenced him to 11 years in prison, consisting of nine years for the attempted murder conviction and two years for the dissuading conviction. The judge imposed, but stayed under Penal Code section 654, three-year sentences on the two assault convictions.[1]

On appeal, Waxlax argues the omission of the following three self-defense related jury instructions requires reversal of his murder and assault convictions: (i) an instruction on the doctrine of transferred self-defense, (ii) CALCRIM No. 3470, which defines self-defense for all nonhomicide offenses, and (iii) a pinpoint instruction that his specific fear of imminent danger arose from his belief he was being robbed. Waxlax also argues his dual assault convictions at the very least violate section 954 because force-likely assault (§ 245, subd. (a)(4)) and assault with a deadly weapon (§ 245, subd. (a)(1)) are different statements of the same offense and his charges were based on the same conduct—his single act of stabbing Kimbler.

---

[1] Unlabeled statutory citations refer to the Penal Code.

2

We find Waxlax's claims of instructional error meritless but agree his dual assault convictions violate section 954. We therefore vacate the force-likely assault conviction in count 2 and strike the fees associated with that count, but we affirm the judgment in all other respects.

# I

# FACTS

A. *Prosecution's Case*

According to Kimbler, he and Waxlax had been friends for several years, but their friendship ended when he started dating Waxlax's ex-fiancé, Shea, about a week after their breakup. When they were friends, Kimbler loaned Waxlax about $1,500, which he never repaid. At trial, Kimbler told the jury he didn't really care about the money because he never expected Waxlax to pay him back.

On March 27, 2015, Kimbler and Shea were celebrating his birthday with some friends at the Red Barn, a bar in Palm Desert. Waxlax also happened to be at the bar that evening but was playing pool with a different group. Kimbler had several drinks over the course of the night and was quite drunk when the bartender announced last call around 1:45 a.m.

As Kimbler was leaving with Shea and his friend, Contreras, they spotted Waxlax sitting in his car in the corner of the parking lot. Earlier in the evening, Kimbler had pointed Waxlax out to Contreras as the guy who used to date Shea, so Contreras decided he wanted to talk to Waxlax. He approached the driver's side window of Waxlax's car

and complimented his stereo system. Leaning onto the driver's side door and speaking through the open window, Contreras asked Waxlax about the money he owed Kimbler. At the same time, Shea slid into Waxlax's backseat. In response, Waxlax opened his door against Contreras and demanded, "what money?" Thinking Waxlax was trying to start a fight, Contreras put up his fists.

When Kimbler saw the situation was turning into an argument, he rushed over and got between Waxlax and Contreras. With his back turned to Waxlax, Kimbler told Contreras it wasn't "worth it" and they should leave. As Kimbler spoke to Contreras, Waxlax came up from behind and stabbed him under his right armpit. He pushed the blade between Kimbler's ribs, all the way to the hilt, then kissed him on the cheek. Kimbler turned around to see Waxlax with a knife in his hands and screamed, "You fucking stabbed me!" before falling to the ground.

Waxlax left, and Shea and Contreras took Kimbler to the hospital, where he spent two weeks in a medically induced coma. The blade punctured his lung and nearly cut his liver in half. Less than an hour after the incident, at 2:27 a.m., he received a text from an unknown number that said, "If anyone goes to the hospital or talks to law, it's done. If my name gets even implied, everyone is done. I know how to handle this s-h-i-t."

At trial, Kimbler said he'd recognized the knife Waxlax used to stab him. Once when they were hanging out, Waxlax had showed him the knife (a Ka-Bar brand, military combat knife) and told him that if he ever wanted to hurt someone to stab them in the side of the chest because that would cause the "most damage."

4

Though Kimbler and Contreras recounted the broad strokes of the incident similarly, their testimony differed on one topic in particular.[2] Kimbler said the first time he'd seen Waxlax that night was in the parking lot after last call. But according to Contreras, Kimbler pointed Waxlax out to him while they were at the bar and wondered why he was there. Contreras said Kimbler told him Waxlax owed him money because he had stolen from Shea. Later, around the time of last call, Kimbler mentioned Waxlax again, saying, "I don't like that guy, and I don't like that he is here."

B. *Defense Case*

Waxlax testified in his own defense and gave yet another version of the events. He denied ever having been friends with Kimbler. He said he and Kimbler used to deal drugs together and that he'd hung out with him only a few times, just to see if he could trust him enough to do business with him. He said he'd been the one to break up with Shea and didn't care that Kimbler was dating her. He didn't know it was Kimbler's birthday that evening and it was just a coincidence he was at the bar.

He was alone in his car when Contreras approached him and got him to roll his window down by asking him something about his stereo system. But Contreras changed topics as soon as the window was down. Leaning in towards Waxlax with both elbows on the window's ledge, Contreras told Waxlax he owed Kimbler money. At this point Waxlax knew something was awry, and he felt unsettled. It was late, the parking lot was dark, and he didn't know this person who was demanding money from him. Just then,

---

[2] Shea did not testify.

Shea jumped into his back seat, tried to hit him, and reached into the center console. Waxlax believed she stole the money he kept in that compartment because when the police inventoried his car after the incident, the money was gone.

After Shea got into his car, Waxlax got out, pushing Contreras aside with the driver's side door. He started yelling for someone to help him remove Shea, while Contreras stood just a few steps away, with his fists up, ready for a fight.

Then Waxlax noticed someone else running toward him, yelling, "Where is my mother fucking money?" He had no idea who the person was, but it was their approach—aggressive and quick—that made him realize he was about to be robbed. "When I heard the person running up saying, 'Where is your mother fucking money at,' that's when everything clicked . . . It clicked I'm being robbed right now." "It's 2:00 in the morning. People are running at me, 'Where is your fucking money at?' I was focused on who these two people are because I don't know this guy. The only person I know is that [Shea] is in my car."

That's when Waxlax made the split-second decision to protect himself. He maneuvered between the two men, reached into the driver's side door and grabbed his knife from the floorboard. He turned around and brandished the knife, warning the two men to "Get the fuck back." This was apparently the moment the stabbing occurred, but Waxlax's testimony on this point is brief and vague. He said he tried to get back into his car but Contreras lunged at him and at that moment he "felt contact with the knife." On

cross-examination, he said the knife was so well made it must have slipped through Kimbler's ribs without him even knowing it.

After realizing his knife had made contact with something, he got into his car and drove away. When the police interviewed him about a half-hour later, he denied knowing about the stabbing or having been in any sort of altercation at the bar. He told the officer that the only knife he was in possession of that evening was a pocket knife, and he didn't mention his belief that a group of people had tried to rob him. At trial, he acknowledged having seen Kimbler at the bar earlier but maintained he had no idea the person who ran up to him, and whom he stabbed, was the same person.

## II

## ANALYSIS

### A.     *Dual Convictions under Section 954*

We begin with Waxlax's assertion that his dual aggravated assault convictions—for assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); count 2)—violate section 954 because he was convicted of two statements of the same offense and both were based on the same conduct. We agree.

Section 954, which governs joinder of counts, says in relevant part: "An accusatory pleading may charge [1] two or more different offenses connected together in their commission, or [2] different statements of the same offense or [3] two or more different offenses of the same class of crimes or offenses, under separate counts, and if

7

two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged."

Our Supreme Court has interpreted this language to mean that section 954 authorizes multiple convictions for different or distinct offenses, "'but does not permit multiple convictions for a different statement of the same offense *when it is based on the same act or course of conduct*.'" (*People v. Vidana* (2016) 1 Cal.5th 632, 650 (*Vidana*), italics added.) The test for whether a statute defines different offenses or merely different ways of committing the same offense turns on legislative intent. "'[I]f the Legislature meant to define only one offense, we may not turn it into two.'" (*Id*. at p. 637.)

Whether force-likely and deadly weapon assault are different statements of the same offense when based on the same act is currently pending before our Supreme Court. (*People v. Aguayo* (2019) 31 Cal.App.5th 758, review granted May 1, 2019, S254554 (*Aguayo*).) Two of the three appellate courts to consider the issue have answered the question in the affirmative, concluding dual assault convictions based on the same criminal act violate section 954. (*People v. Brunton* (2018) 23 Cal.App.5th 1097, 1100 (*Brunton*); *People v. Cota* (2020) 44 Cal.App.5th 720 (*Cota*).) The third court disagreed. (*In re Jonathan R.* (2016) 3 Cal.App.5th 963 (*Jonathan R.*).) But as we'll explain, we agree with *Brunton* and *Cota*.

8

Although now located in two separate subparagraphs of section 245, subdivision (a), force-likely and deadly weapon assault were initially contained in a single statute defining aggravated assault. Under that provision, "'[e]very person who commits an assault upon the person of another with a deadly weapon or instrument *or* by any means of force likely to produce great bodily injury'" was guilty of aggravated assault. (*In re Mosley* (1970) 1 Cal.3d 913, 918, fn. 4, italics added.) Our Supreme Court interpreted this language as defining "only one offense" that could be committed in two different ways, explaining "assault by means of force likely to produce great bodily injury is not an offense separate from—and certainly not an offense lesser than and included within—the offense of assault with a deadly weapon." (*Id.* at p. 919, fn. 5.) Though *Mosley's* language was dicta, our appellate courts found it persuasive, and for the years the statute remained in this form, they agreed that "'[t]he offense of assault by means of force likely to produce great bodily injury is not an offense separate from . . . the offense of assault with a deadly weapon.'" (*People v. McGee* (1993) 15 Cal.App.4th 107, 114; see also, e.g., *People v. Martinez* (2005) 125 Cal.App.4th 1035, 1043 [noting "the statute describes two different ways of committing a prohibited assault"].)

In the early 1960s, the Legislature redesignated the aggravated assault provision as subdivision (a) of section 245. Two decades later, they further redesignated the provision, labeling it subdivision (a)(1), but nevertheless keeping force-likely and deadly weapon assault together as they always had been. (*Jonathan R.*, *supra*, 3 Cal.App.5th at p. 968.) And, because the two types of assault remained together, the understanding persisted that

9

section 245, subdivision (a)(1) provided two alternative statements of aggravated assault. (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1035 ["the jury's decision-making process in an aggravated assault case under section 245, subdivision (a)(1), is functionally identical regardless of whether, in the particular case, the defendant employed a weapon alleged to be deadly as used or employed force likely to produce great bodily injury; in either instance, the decision turns on the nature of the force used"].)

In 2011, the Legislature amended section 245, subdivision (a)(1) again, this time placing force-likely and deadly weapon assault into two separate numbered paragraphs— deadly weapon assault remained in subdivision (a)(1) and force-likely assault could now be found in newly created subdivision (a)(4). (Assem. Bill No. 1026 (2011-2012 Reg. Sess.); Stats. 2011, ch. 183, § 1.) The Legislature explained the amendment served a disambiguating purpose for recidivist sentencing.

Specifically, because the "Three Strikes" law carries consequences for prior deadly weapon assault convictions *but not force-likely convictions*, the Legislature separated the two types of aggravated assault to make it readily apparent to the prosecution and the court in potential future cases which type the defendant had been convicted of.[3] (*Brunton*, *supra*, 23 Cal.App.5th at pp. 1104-1105, citing Sen. Com. on

---

[3] "Assault with a deadly weapon is always a serious felony for purposes of recidivist sentence enhancements (see § 1192.7, subd. (c)(31)), whereas force-likely assault is only a serious felony if the defendant actually inflicted great bodily injury (and not merely used force likely to do so) (see § 1192.7, subd. (c)(8))." (*Brunton*, *supra*, 23 Cal.App.5th at p. 1104, fn. 5.)

Public Safety, Analysis of Assem. Bill No. 1026 (2011-2012 Reg. Sess.).) "AB 1026 will make it easier for prosecutors and defense attorneys to determine whether or not a defendant's prior conviction for assault under . . . [s]ection 245(a)(1) involved an assault on a person with a deadly weapon or by any means of force likely to produce great bodily injury. . . . [¶] 'AB 1026 does not create any new felonies or expand the punishment for any existing felonies. It merely splits an ambiguous code section into two distinct parts.'" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1026 (2011-2012 Reg. Sess.) as introduced Feb. 18, 2011, p. 3.)

As the court observed in *Cota*, the 2011 amendment "resurrected the question of whether" force-likely and deadly weapon assault are still two different ways to commit the same offense. (*Cota*, *supra*, 44 Cal.App.5th at p. 725.) The first opinion to consider the issue was *Jonathan R.*, which held that the new structure of section 245, subdivision (a) conveyed such an unambiguous expression of legislative intent to "creat[e] separately convictable offenses" that an examination of the legislative history of the 2011 amendment was unnecessary. (*Jonathan R.*, *supra*, 3 Cal.App.5th at p. 971.) The court based its conclusion on its interpretation of *People v. Gonzalez* (2014) 60 Cal.4th 533, which it regarded as "[t]he Supreme Court's latest word on the issue." (*Jonathan R.*, at p. 969.) Based on that precedent, *Jonathan R.* reasoned that any time the Legislature

11

places offenses "in separate subdivisions"—as the 2011 amendment to section 245 did—it is "deemed to have intended to create separate offenses."[4] (*Jonathan R.*, at p. 971.)

But a little over a month before *Jonathan R.*, our Supreme Court issued *Vidana*, in which it considered whether larceny (§ 484, subd. (a)) and embezzlement (§ 503) were different statements of the same offense such that a defendant could not be convicted of both based on the same course of conduct. After analyzing not just the text and structure of the larceny and embezzlement statutes but also their legislative history, the court concluded the statutes contained restatements of the same offense, even though they "have different elements," "neither is a lesser included offense of the other," and they are found in "self-contained" statutes. (*Vidana*, *supra*, 1 Cal.5th at p. 648.) Important to the court's conclusion was the fact that larceny and embezzlement "generally have the same punishment," and that the Legislature has directed the courts to substitute the word "theft" for "larceny," "embezzlement," or "stealing" any time those words appear in the Penal Code. (*Id.* at pp. 648-649, citing § 490a.)

The next two opinions to consider the connection between force-likely and deadly weapon assault were *Brunton* and *Cota*, and both found *Johnathan R.'s* total reliance on the structure of section 245, subdivision (a) unpersuasive. Following the approach taken in *Vidana*, *Brunton* and *Cota* considered not only the text and structure of section 245 but also "prior case law interpreting section 245, subdivision (a)(1), as setting forth a single

---

[4] This wasn't the end of the court's section 954 analysis, however. It ultimately concluded the dual assault convictions violated the statute because force-likely assault is a necessarily included offense of deadly weapon assault. (*Jonathan R.*, *supra*, 3 Cal.App.5th at p. 975.)

12

aggravated assault offense," as well as the legislative history of the 2011 amendment. (*Cota*, *supra*, 44 Cal.App.5th at p. 728, citing *Brunton*, *supra*, 23 Cal.App.5th at p. 1107.) Those courts concluded "the Legislature did not intend for its 2011 amendment of section 245 to create two offenses where the former statute set forth only one." (*Brunton*, at p. 1107; *Cota*, at p. 728.) "[W]hen based on a defendant's single act of using a noninherently dangerous object in a manner likely to produce great bodily injury, section 245 (a)(1) and (4) are merely different statements of the same offense such that the defendant may not be convicted of violating both subparts of the subdivision." (*Brunton*, at p. 1107.)

We agree with *Brunton* and *Cota*. In our view, those opinions have accurately interpreted the Legislature's view of aggravated assault by harmonizing the history of the aggravated assault statute with our lawmakers' expressed reason for reorganizing section 245, subdivision (a). For over a century, the two forms of assault were contained within the same statutory provision and were understood by our courts to be simply two ways to commit the same offense. When the Legislature placed them into two separate numbered paragraphs within section 245, subdivision (a), they made clear they were not "creat[ing] any new felonies" but rather reorganizing the subdivision to make matters less "ambiguous" for the prosecution and defense in potential future sentencings.

On balance, given the history of section 245, the legislative history of the 2011 amendment, and the fact that force-likely and deadly weapon assault carry the same punishment, we conclude they are different statements of the same offense when they are

13

based on the same criminal act. Because that is the case here, we conclude Waxlax's dual assault convictions violate section 954, and we therefore vacate the force-likely assault conviction in count 2 and strike the $40 court operations fee (Pen. Code, § 1465.8) and the $30 court facilities fee (Govt. Code, § 70373) associated with the conviction.[5] Our conclusion does not impact Waxlax's total sentence because, as noted, the trial judge stayed the term on count 2 under section 654.

B.     *Claims of Instructional Error*

Waxlax asserts three claims of instructional error. He argues the jury should have received (i) CALCRIM No. 3470, the self-defense instruction applicable to nonhomicide offenses, (ii) an instruction on the doctrine of transferred self-defense, and (iii) the optional language in CALCRIM No. 505 (the self-defense instruction for homicide offenses) indicating that his fear of imminent danger was based on his belief he was being robbed.

A trial judge has a sua sponte duty to instruct the jury on "all general principles of law relevant to the issues raised by the evidence." (*People v. Souza* (2012) 54 Cal.4th 90, 115.) The general principles of law governing the case are "'those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) A court

---

[5] Given our conclusion, we need not address Waxlax's alternative argument as to why his dual assault convictions violate section 954—that force-likely assault is a necessarily included offense of deadly weapon assault. Our Supreme Court has also granted review of this issue in *Aguayo*. (*Aguayo*, *supra*, 31 Cal.App.5th 758, review granted May 1, 2019, S254554.)

14

has a sua sponte duty to instruct on a defense "'if it appears that the defendant is relying on such a defense, or if there is *substantial evidence* supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.'" (*Id*. at p. 157, first italics added.) In this context, "substantial evidence" means evidence which would permit a reasonable jury to find the defense applies. (*People v. Hanna* (2013) 218 Cal.App.4th 455, 462.)

The sua sponte obligation to give general instructions does not, however, extend to "pinpoint" instructions or optional paragraphs of instructions. (*People v. Lawley* (2002) 27 Cal.4th 102, 160-161.) "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.)

We review claims of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) "'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.'" (*Ibid.*)

We start with Waxlax's claim the judge should have instructed the jury with CALCRIM No. 3470, the general self-defense instruction for nonhomicide offenses. Waxlax acknowledges the jury was instructed on the doctrine of self-defense in the context of the attempted murder with CALCRIM No. 505, and he concedes that instruction provides a correct statement of the law. Nevertheless, he argues the lack of a similar instruction for the assault charges constitutes reversible error.

We disagree. In light of Waxlax's testimony and the fact the assault charges were based on the same act as the attempted murder charge, we conclude the omission of CALCRIM No. 3470 was harmless under either the federal or state standards. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 199 [California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"].) The difference between CALCRIM No. 3470 and CALCRIM No. 505—that is, the difference between self-defense in the homicide context and self-defense that will justify an assault—lies in the type of the threat the defendant believed they faced. To justify a homicide or attempted homicide, the defendant must believe that "danger" or "great bodily harm" is imminent, whereas an assault committed in self-defense may be justified if the defendant feared that any "bodily injury", or even an "unlawful touching," was imminent. For both homicide and assault, the amount of force the defendant uses must be no more than reasonably necessary to fend off the perceived threat.

16

Here, the evidence did not implicate the difference between the two types of self-defense. This is because Waxlax provided the same justification for the attempted murder charge as he did for the assaults, and the justification wasn't that he feared a robbery accomplished by means of an unlawful touching or a simple injury. Instead, he told the jury he grabbed his knife "[s]o I can fight a bunch of people" because "I don't know who has a gun or weapons." Thus, according to his own testimony, he feared his perceived assailants had weapons and would use them to take money from him. In other words, he feared great bodily harm.

But even if Waxlax's testimony could support a finding that he believed Kimbler and Contreras were unwilling to *seriously* injure him for the money but intended only to touch him in some unlawful way, CALCRIM No. 3470 is still inapplicable. This is because, if the jury believed he feared a lesser threat from the two men, his decision to defend himself with a knife becomes unreasonable or more than necessary to fend off the perceived threat. In short, Waxlax's testimony supported only one theory of self-defense, that he feared his attackers were armed and would seriously harm him to get what they were after. As a result, CALCRIM No. 505 sufficiently instructed the jury on the principles relevant to the evidence presented at trial.

Next we address Waxlax's claim that the jury should have received an instruction on transferred self-defense. That doctrine applies where the defendant acts justifiably in self-defense and in so doing "inadvertently [causes] the injury of an innocent bystander." (*People v. Mathews* (1979) 91 Cal.App.3d 1018, 1024.) Waxlax argues transferred self-

17

defense applies to his case because his testimony shows the only person he saw as a threat was Contreras. He argues the lack of an instruction on the doctrine presented the jury with a false all-or-nothing choice regarding his claim of self-defense: either he acted to defend himself against Kimbler or he intended to harm him. He argues his testimony permitted the jury to find a third scenario was true—that he *accidentally* stabbed Kimbler in an effort to protect himself from *Contreras*.

We conclude the record does not support such a scenario. Contrary to his characterization of his testimony on appeal, Waxlax told the jury he was scared of both men and grabbed his knife to defend against both of them. He made this clear several times during his testimony, including when he said he grabbed his knife "[s]o I can fight a bunch of people" because "I don't know who has a gun or weapons," as well as when he said he brandished the knife at "them" and told them to back up. Indeed, he said it was *Kimbler's* act of running towards him yelling about money that made him realize he was being robbed. The record contains no evidence suggesting he feared Contreras only.

Finally, we turn to Waxlax's claim that the lack of a robbery pinpoint instruction constitutes reversible error. Recognizing judges have no sua sponte obligation to provide pinpoint instructions, Waxlax argues his counsel's failure to request the instruction constitutes another instance of ineffective assistance. In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that his attorney's performance was deficient and that the deficiency was prejudicial or had a tendency to affect the outcome of trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 690.)

18

Sufficiency of his counsel's performance aside, we conclude the lack of the pinpoint instruction was harmless. (*People v. Barber* (2020) 55 Cal.App.5th 787, 799 ["Any error in refusing to give a requested pinpoint instruction is reviewed under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818"].)In relevant part, CACLRIM No. 505 says an attempted murder may be justified if the jury finds Waxlax "reasonably believed that [he] was in imminent danger of being killed or suffering great bodily injury." (CALCRIM No. 505.) The instruction contains optional bracketed language that can be added to the end of this phrase if warranted by the evidence. That optional language says, "or was in imminent danger of being (raped/maimed/robbed/____ [insert other forcible or atrocious crime])."

The point of the optional language is to identify Waxlax's theory of self-defense for the jury, but his trial testimony and the closing arguments from both sides did an adequate job of that. Waxlax spent the majority of his testimony explaining that he thought he was being robbed, and both sides highlighted that testimony at length in their closing remarks to the jury. Additionally, it is not as though the generic threat language in CALCRIM No. 505 was at odds with Waxlax's testimony such that it could lead the jurors to reject his claim of self-defense even if they credited his testimony that he thought he was being robbed. Waxlax testified that both men asked him about money and acted aggressively and that he feared they might have weapons. While this testimony supports a finding that he thought he was being robbed, it equally supports a finding that he thought he was in imminent danger of serious bodily harm.

19

"Forcible and atrocious crimes are generally those crimes whose character and manner reasonably create *a fear of death or great bodily injury*." (CALCRIM No. 505, citing *People v. Ceballos* (1974) 12 Cal.3d 470, 479, italics added.) As such, the pinpoint instruction is designed to underscore the reasonableness of a defendant's fear of death or serious harm by focusing the jury on their belief they were about to become the victim of a robbery. But here, Waxlax's testimony and the closing arguments from both sides focused the jury on his belief he was being robbed. Waxlax spent the majority of his direct examination explaining why he thought he was being robbed, and both sides highlighted that testimony at length in their closing remarks to the jury. Under these circumstances, we conclude that "[a]dding an additional instruction that [Waxlax] could have acted in self-defense if he had a fear of great bodily injury or death *due to robbery* would not have changed the jury's finding on this point." (See *People v. Morales* (2021) 69 Cal.App.5th 978, 994, italics added [because the trial testimony and closing argument articulated defendant's self-defense-from-robbery theory, any error in omitting the robbery pinpoint instruction was harmless].)

### III

### DISPOSITION

We vacate the conviction for assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)) in count 2 and strike the corresponding court operations (Pen. Code, § 1465.8) and facilities fees (Govt. Code, § 70373) but otherwise affirm the judgment. We direct the trial court to prepare an amended abstract of judgment reflecting the

20

judgment as modified in this opinion and forward a certified copy to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION

SLOUGH _____
                                                                    J.

We concur:

McKINSTER _____
                    Acting P. J.


MENETREZ _____
                    J.

21